## No. 6092.

### WESLEY WILLIAMS *v.* THE STATE.

MURDER—FACT CASE—See the statement of the case for evidence *held* sufficient to support a capital conviction for murder.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

Being convicted in the first degree for the murder of his wife, Eliza Williams, the appellant was awarded the death penalty by the jury. The murder was committed in Falls county, Texas, on the fifth day of March, 1887.

A. E. Watson was the first witness for the State. He testified that he lived in Marlin, Falls county, Texas. He got home from his business about dusk—which was about seven o'clock—on the evening of March 5, 1887. Eliza Williams, the deceased, who was then in the employ of the witness as cook, rang the supper bell just as witness got home. Witness and his family sat down at the table, and had just begun their meal when witness's son and Matt Watkins came together from the cow pen—witness's son to the dining room and Watkins to the kitchen. The boys about that time raised an alarm and called witness to the kitchen. On reaching the kitchen the witness found the cook lying, back down, on the kitchen floor. She was then senseless, and never spoke afterwards. Witness then looked around for the weapon used on deceased, and missed from its accustomed place in the trash box one of his steelyard peas. He then looked for, and found, the pea in the yard near the gate of the division fence. The said pea weighed about eight pounds. The woman had been stricken on the right side of the head with a blunt instrument of some kind. She had also been stricken a less severe blow on the left side of the head, and her right ear was slightly cut. A large carving knife was lying on the floor by the side of the deceased, and a ham, partly sliced, was on the table. It was evident that the woman was cutting slices from the ham when she was stricken. The dining room and kitchen of the witness's house were separated by a narrow passage. The witness hired the deceased about a week before her death, which

occurred on March 7, the second day after she was wounded. The witness had never known or seen the defendant until after his arrest. The witness identified the following as a correct diagram of the dining room, kitchen, etc.:

George Annie Holmes testified, for the State, that she went to the kitchen of Mr. Watson a little after dark on the evening of March 5, 1887, to take a cabbage sent by Mr. Andrew Butler. When she went into the kitchen she saw a man sitting on the trash box. He was a "bright colored man, and wore side burn whiskers." Eliza had just taken in the supper. Witness remained in the kitchen but a few moments, and heard nothing said by either the man or the deceased. The man had a bundle in his lap. The Watson supper bell rang just as witness was passing through the yard gate on her return to Butler's. Witness recognized the defendant as the man she saw in Mr. Watson's kitchen on that occasion.

Matt Watkins testified, for the State, that he lived at the house of Mr. A. E. Watson, in the town of Marlin, Falls county, Texas. He knew the defendant, and formed the acquaintance of the deceased at Watson's house when she came there to cook. Defendant came to Watson's cow pen late on the evening of March 5, 1887, while witness was watering the cows. After looking at witness for a few minutes, he went on to Watson's kitchen. When witness got through watering the stock, he went to the kitchen to get the milk vessels. When he stepped into the kitchen he saw the defendant in there, sitting on the box in which the steelyard peas were kept, and in which they were earlier in the evening. Witness and Bud Watson then went to the cow pen. But before going to the cow pen the wit-

ness heard the defendant tell the deceased that Mr. Bloxam was sick, and that he had told Mrs. Bloxam that he did not know where the deceased was, but would find her and try to get her to go to Bloxam's. Deceased told him in reply that she had a good enough home, and would not leave it. As the witness left the kitchen to go to the cow pen, he heard the defendant muttering, but did not understand what, if anything, he said. While in the kitchen, witness asked defendant if he was going home that night. He looked at witness, and replied: "That is my wife, sir; I may go home in the morning." Something was said by deceased about a note, and defendant said to deceased in reply: "It is a lie!" Deceased was standing at the table slicing ham when witness left the kitchen to go to milk the cows. She was standing with her side face towards defendant. On his return from the cow pen to the kitchen, the witness found the woman lying on the floor with her head towards the fire place. Witness then called to Bud Watson to summon his father. A piece of meat lay on the floor near deceased's hand, and the dish pan of water was sitting on the floor near her side. Witness did not observe the carving knife at that time. One of the steelyard peas was then missed from its accustomed place, and was found in the yard near the division fence gate. The witness identified the steelyard pea in evidence as the one he found in Watson's yard, and said that it weighed eight pounds.

Rollin Williams testified, for the State, that he knew the defendant. About half past five o'clock on the evening of the fatal day, the defendant came in a wagon with Mr. Butcher, to the shop where the witness worked. Defendant had a bundle with him, and Mr. Butcher had some plows in the wagon. Defendant asked witness where Mr. Watson lived, and told him that his wife was staying at Watson's and that he wanted to go and see her. The witness directed him to Watson's house, when he left, remained away quite a while, and returned with the bundle in his hand. He soon left and witness did not see him again until after his arrest.

Doctor R. C. Nettle testified, for the State, that, on the evening of March 5, 1887, he was called to Mr. Watson's house to see the deceased, whom he found in the kitchen senseless, and badly wounded about the head. She died two days later, when witness made an autopsy of the head. The witness then described the two wounds which he found on the woman's head, and de-

clared that either was necessarily a fatal wound, and that they were the cause of the woman's death.

Lewis Guy testified, for the State, that he lived on Mr. Butcher's place in March, 1887, and there knew the defendant. Witness and defendant went to Marlin together, in Butcher's wagon on the fifth day of said March. Witness drove the wagon, and knew, when he left Butcher's house, that defendant was not going to return with him. They got to town about three o'clock in the morning, and witness took the wagon home in the evening. Butcher lived on the west side of the Brazos river, about a mile from the bridge, and about six miles from Marlin. Witness and defendant were both employed on Butcher's place. About eight o'clock on that evening the witness went to the house of his father, Elbert Guy, and met the defendant. When, shortly afterwards, witness started to Butcher's store, defendant asked him not to tell Mr. Etheridge, the clerk, that he, witness, had seen him, defendant.

Cyrus Whittaker, sheriff of Falls county, testified, for the State, that he lived within a few hundred yards of Colonel Watson's house, in Marlin. A little after dark on the evening of March 5, 1887, Colonel Watson came to witness's house and informed him of the recent assault upon his cook. Witness and his deputy, John L. Bates, at once started on horseback in pursuit of the defendant. They traveled in a brisk trot over the Brazos bridge turn pike, to Mr. Butcher's place, west of the Brazos river. Witness failed either to find or hear of the defendant on that night. Defendant eluded arrest for several months, but was finally apprehended in Milam county by deputy sheriff John T. Barlow.

William Hunnicutt testified, for the State, that he lived in Marlin, Falls county, Texas. He had occasion to go to the western part of the county on the fifth day of March, 1887. He returned home on that night, traveling east over the turn pike road which leads from the Brazos bridge to town. At a point on the said road, about a half mile east of the said bridge, he met the defendant, whom he knew. Defendant was walking rapidly, going west. Witness did not speak to defendant, nor did defendant speak to him. At a point a half mile nearer town, the witness met Sheriff Whittaker and Deputy Bates, going west. The officers did not stop on meeting witness, but rode forward in a rapid gate. Defendant could not then have been more than thirty minutes ahead of the sheriff and his deputy.

Witness rode on home, put up his horse, and observed that it was then ten o'clock.

Mingo Strahan testified, for the State, that, while standing on the west end of the Brazos bridge, early on the night of March 5, 1887, he heard some person coming towards him. Presently the defendant, whom the witness knew well, rode up to witness and said: "Hello? Who is this?" Witness replied: "It is Mingo; who the devil are you?" Defendant replied: "It is Wesley," and added: "I have got my wife." Witness knowing that defendant and his wife were separated, asked him: "Where is she?" Defendant replied: "I have knocked hell out of her!" Witness asked: "How?" Defendant replied: "I have sure killed her! I hit her with a steelyard pea." About this time two horsemen, riding west, started across the bridge. Witness stepped aside and defendant disappeared. When the two horsemen passed witness recognized them as Sheriff Whittaker and Deputy Bates.

Elbert Guy testified, for the State, that he lived at McGee's place, west of the Brazos river, about three hundred yards distant from Mr. Butcher's place. About nine o'clock on the night of March 5, 1887, the defendant came to witness's house and called him out. He then told witness that he had killed his wife in Marlin, and asked witness whether or not it would be best for him to go to Butcher's for the night and surrender in the morning. Witness advised him to pursue that course. Defendant then left, and witness did not see him again until after his arrest. He did not tell· witness why he killed his wife, nor did he mention any particulars of the killing.

Mr. Moon testified, for the State, that he was at old man Elbert Guy's house on the night of March 5, 1887, and on that night at about nine o'clock heard the defendant telling old man Guy that he had killed his wife in Marlin. He soon afterward saw the defendant disappearing under the wire fence, and next saw him after his arrest.

A. L. Butcher testified, for the State, that the defendant entered his service a short time before March 5, 1887. The witness sent his wagon to town on said March 5 in charge of the defendant and another freedman. Defendant did not return with the other freedman when the latter brought the wagon back on that evening. Before the defendant started to town on that morning, witness gave him an order on J. D. McDonald, of Marlin, for three and a half dollars due him on work, which

order was paid by McDonald. The defendant never came about the witness again, and witness knew nothing of his whereabouts after the murder of Eliza Williams. About a week prior to the murder the defendant tried to make arrangements with witness to employ his wife. His wife was on witness's place at that time, and stayed there that night, but witness was unable to say whether or not she slept that night with defendant. Witness did not know whether or not defendant's wife heard or knew of defendant's proposition to witness to employ her.

W. A. Patrick testified, for the State, that he lived on the southwest corner of the court house square, in Marlin, Texas, and knew deceased in her life time. She was in the employ of witness as cook in November, 1886. She was then separated from the defendant, who was known as her husband. Defendant at that time lived at Chilton. One night the witness was awakened by the screaming of the deceased, and repaired to her room. As the witness stepped into the room of the deceased she fell almost senseless at his feet. She was very much frightened and almost speechless from a recent choking. While screaming she hallooed to witness that Wesley Williams was choking her to death. Her cries of distress were at first loud and distinct, but decreased in volume until witness started to her room. On the next morning the witness observed the plain marks of choking on her throat. She afterward made an affidavit against defendant for choking and whipping her on that occasion, and defendant was prosecuted to conviction therefor before a jury in the county court. He afterward escaped, but was re-arrested and re-confined to serve out his penalty for that offense. Deceased did not stay at the witness's house long after the midnight assault upon her by the defendant. She was a good servant, but the witness's wife was apprehensive of continued assaults upon her by her husband, and dismissed her. She went to work for Mr. Cliff Oltorff after leaving witness's employ, and after quitting Oltorff she entered the service of Colonel Watson.

C. A. Norwood, jailor of Falls county, testified, for the State, that defendant was convicted on December 12, 1886, for aggravated assault upon his wife, and was placed in jail under the charge of the witness. Witness kept him in jail until January 22, 1887, when he was released on a convict's bond.

Deputy Sheriff Barlow testified, for the State, that he made frequent and diligent searches for the defendant after the mur-

der of Eliza Williams, but did not find him until the lapse of seven months, when he arrested him in Milam county.

The State closed.

Dick Campbell was the first witness for the defense. He testified that he knew the defendant and the deceased for two years before the fatal March 5, 1887. Defendant and his said wife moved to Chilton, in Falls county, on or about January 1, 1885. They lived together as husband and wife, and for some time after they became residents of Chilton they appeared to live happily and in harmony with each other. They lived very near the witness's house in the said town of Chilton. The deceased left the defendant in Oct. ber, 1886, and went to a cabin on the Brazos river in which she lived for awhile with one Ike Hutchinson. She left the cabin in the course of a few weeks, and went to Marlin to live. Soon after his wife left him, the defendant, evidently in great mental distress, told witness that Ike Hutchinson had taken his wife away from him, and that he, defendant, could not live without his wife. Defendant was a man about fifty years old. His wife was about thirty-five years old at the time of her death. They had a son named —— Williams, who was about twenty-one years of age. From the time that the deceased left the defendant in October, 1886, they lived separate and apart from each other until about February 10, 1887, when they came together to the witness's house. They lived at witness's house as man and wife for three or four days and nights. They then went to Mr. Butcher's house, when deceased again left defendant. For some time thereafter the defendant appeared to be much distressed in his mind, complained greatly of his abandonment by his wife, and protested that he could not live without her. Witness did not know the present whereabouts of Ike Hutchinson.

Luke Johnson testified, for the defense, that he knew the defendant and the deceased for two years prior to the murder of the latter. They came to Chilton together in January, 1885, and lived there as man and wife until some time in October, 1886, when the deceased, taking up with one Ike Hutchinson, left the defendant and went to live with Hutchinson in a cabin on the Brazos river. The defendant was a man of about fifty years of age; the deceased, at the time of her death, a woman of about thirty-five years of age. They had a son who was now a young man about twenty-one years old. Deceased left the Hutchinson cabin on the Brazos river in November, 1886, and went to

Marlin.  She and defendant never lived together as man and wife from the time of their separation, in November, 1886, until her death, except three or four days and nights they spent together at Dick Campbell's house.  It was after the conviction of the defendant for aggravated assault upon deceased that they went to Campbell's house and lived together three or four days and nights.  They separated again, and that separation in particular, which was in February, 1887, appeared to greatly distress the defendant.

No brief for the appellant has reached the Reporters.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE.  This conviction is for murder in the first degree, and the penalty assessed by the jury is death.  No question requiring discussion is presented in the record.  The indictment is a good one; the charge of the court is full and correct, and more favorable to the defendant in some particulars than the evidence demanded.

There can be no doubt as to the sufficiency of the evidence, none of which was objected to on the trial.  Not only did the defendant confess his guilt of the crime, but it was conclusively proved independently of such confession by the circumstantial evidence.  Deceased was the wife of the defendant, and express malice on his part toward her, as well as motive actuating him to perpetrate the murder, are shown by the evidence.  It was a cruel and deliberate murder, well meriting the extreme penalty assessed by the jury.

The judgment is affirmed.

*Affirmed.*