GEORGE HENRY v. THE STATE.

No. 1555. Decided November 10, 1897.

1. **Misnomer in Indictment—Suggestion by Defendant of True Name—When to Be Made.**

The time for a defendant to suggest his true name and move the court and have the prosecution proceed against him in his true name, is when he is arraigned. If it is not then done, by express provision of article 548, Code of Criminal Procedure, the name by which he is indicted shall be taken as his true name, and he shall not thereafter be allowed to deny the same by way of defense. Such a suggestion comes too late after arraignment, and a plea of not guilty. Following Wilcox v. State, 31 Texas, 586.

2. **Continuance—Diligence.**

Where an application for continuance shows nothing with regard to the witnesses except that they were served with process in March, and that they were not present on the day of trial (28th day of June); Held, a total want of diligence is manifest. To manifest proper diligence, the bill of exceptions should have shown that the witnesses were present when the court met, or on the day set apart for taking up the criminal docket. The court, on appeal, will not assume such facts in aid of the bill of exceptions.

3. **Continuance—New Trial—Controverting Affidavit of Absent Witness.**

Where an application for continuance was for a witness who, it was alleged, would testify to facts which would have contradicted material testimony of an important State's witness; Held, that it was legitimate and competent for the prosecution, when the matter came a second time before the court on the motion for new trial, to controvert the allegations by the affidavit of the proposed absent witness, showing that said witness, instead of contradicting, would corroborate the State's witness in every material particular, and would be a material witness against defendant.

**4. Same.**

A continuance should not be granted where the application states mere conclusions or is couched in such general terms that perjury could not be predicated upon said allegations if false. And, when considered on appeal, if it appears from the other evidence in the case that the proposed absent testimony is not probably true, or that it would not probably change the result of the trial, it will be held, that the motion for new trial, in so far as it involved the application, was properly overruled.

**5. Confessions or Admissions—Warning and Caution by Officer.**

When not more than an hour before defendant made the statement or admission introduced in evidence against him, it appeared that he had been warned and cautioned by the officer who still had him in charge when it was made, such statement was legal and competent evidence.

**6. Same—As to a Particular Fact Stated When Defendant Was in Arrest Upon a Different Offense.**

On a trial for murder, the question of defendant's age at the time he committed the homicide being an important issue; Held, it was legitimate for the prosecution to prove that when defendant was previously under arrest, charged with a different offense, and after he had been properly warned and cautioned by the officers having him in arrest, he stated to said officers, among other things, what his age was; Held, although he was then in arrest in another case and such statement was not in the nature of a confession or admission in this case, it being nevertheless the statement of a fact, it was admissible in evidence.

**7. Confessions—Construction of Statute.**

Our statute, in regard to confessions (C. C. P., article 790), does not exclude as evidence in another case, such statements or declarations as are made under the conditions prescribed in the statute, and therefore, if a defendant under arrest, and at the time being duly warned, makes a statement, such statement may be used in any case in which he is then under arrest, or in any other case if the statement involves a material fact and is otherwise admissible.

**8. Evidence as to Age.**

Upon the issue as to the age of the defendant, proposed testimony of witnesses that they were larger in size than defendant, and that they were not over 16 years of age, was no test or criterion as to defendant's age, and was therefore properly rejected by the court.

**9. Murder—Means or Instrument—Charge.**

On a trial for murder, where the means or instrument used was a stick of wood, the issue as to whether the same was a deadly weapon or an instrument calculated to produce death from the manner in which it was used, was correctly and clearly presented in the charge, as follows, viz: "The instrument or means with which a homicide is committed are to be taken into consideration in judging of the intent of the party offending. If the instrument be one not likely to produce death, it is not be presumed that death was designed, unless from the manner in which it was used such intent evidently appears."

**10. Murder in the First Degree—Evidence Sufficient.**

See facts stated which are held by the court amply sufficient to support a judgment for murder in the first degree with the penalty assessed at death.

Appeal from the District Court of Wise, on change of venue from Denton. Tried below before Hon. J. W. Patterson.

Appeal from a conviction for murder in the first degree; penalty assessed at death.

Appellant was charged by the indictment with the murder of Floyd Coberly, by striking and beating him with a stick of wood, in Denton County, on the 23d of February, 1897.

Deceased, Frank Coberly, was the jailer of Denton County. He had been acting as such about ten days preceding his death. Defendant,

George Henry, and two other negroes, Arthur Gilmore and Will Miller, had been tried and convicted of theft of over $50 in Hill County. They were also charged with burglary in Denton County, and the sheriff of Hill County had turned them over to the sheriff of Denton County, who confined them in the Denton County jail in November, 1896. There were several other prisoners confined in the Denton County jail, most of them white men. But these other prisoners were confined in the lower tier of cells, and defendant, George Henry, Arthur Gilmore, and Will Miller, were confined in the upper tier of cells—there being no other occupants in the upper tier. The outer door of the upper cells was at the west end of the cages and outside this door was a platform about four feet square. This platform was reached from below by an iron stairway.

Otho Williams, one of the white men confined in the lower tier of cells, testified that about a week prior to the 23d day of February he had been confined in said jail on a complaint filed against him for burglary. That the grand jury had never indicted him for said offense and that he had been discharged from jail as soon as the case was investigated. This witness further testified, that on the morning of the 23d of February, Coberly, deceased, came to the cells of the white prisoners about 10:30 o'clock and got the dishes out of the corridor. He says: "After Mr. Coberly had removed our dishes and pans, he started up the stairs that lead from the floor of the jail up to the second tier of cells where the negroes were confined. The foot of the stairs is right at the corner of cell No. 1, in which I then was, and as the west wall of the cell is of open round bars placed several inches apart, and as the stairway runs along up the side of the cell, I could see Mr. Coberly perfectly well till he passed on to the platform in front of the upper cells. He passed within a foot or two of where I was standing. As he passed me I asked him what time it was, and he said it was about half after 10 o'clock. I was then in cell No. 1, or the extreme west cell, which is located nearest to the steps leading up to the cells where the negroes were. I occupied cell No. 3 at night, which is the most eastern cell, but in the daytime all the prisoners were turned loose in the corridor and could go into any of the cells. At this time I had gone from the corridor into cell No. 1 to get a match to light a cigarette, and was in the cell as Mr. Coberly went up the stairs. The first thing that I heard or noticed after he went up the stairs was his throwing the 'brake' to lock the cells in which the prisoners were confined. I had heard this noise often and knew what it was. Before entering the corridor to get the dishes the jailer would always make all prisoners get into their cells and shut the doors, and then, by means of the 'brake,' which works from the outside, he would lock the cell doors; and then unlock the door of the corridor and go in and get the dishes and pans. The next thing I heard, after I heard the brake thrown was the sound of a lick or blow, and then a sort of scuffling or shuffling sound, and then I heard what sounded like another lick and then I looked up the stairs and saw Mr. Coberly's feet and heard another lick, and saw the end of a stick, but could not see who had it. Mr. Co-

berly's feet were hanging over the platform, as if he was lying down upon it. Immediately after this last lick, Mr. Coberly fell or rolled down the stairs right by where I was standing and fell on the floor on his side, with his head toward the north outside wall of the jail and his feet reaching nearly to the cell where I was, but slanting to the southeast. The jail wall is only about three feet, or perhaps four, from the bars that make the wall of the north side of the cell, and there was not room for him to have lain straight across if he had been lying straight. The north wall of the cell is all open like the west one, and, in fact, all the cell walls are open work except the two partition walls between the cells; that is, the lower cells in which the white prisoners were. I do not know about the upper cells. Coberly fell only a few feet from where I was standing, and I could see him as plainly as I can see you [referring to one of the counsel]. When Mr. Coberly fell, the defendant, George Henry, whom I now see in the court, followed him rapidly down the steps. He had in his hand an oak or blackjack stick, and he came down to where Mr. Coberly was lying, and hit him two licks about the back of his head with the stick that he brought down with him. At this time Coberly was lying still, as if dead, and I saw a great deal of blood running from about his head. After striking Mr. Coberly the last two blows, the defendant went back up the steps to where they had come down; this is up to the landing at the head of the stairs, and I heard him throw the brake off and say, 'Come on, boys; by God, we are out!' And then he came on down the stairs, followed by the other two negroes. The three negroes then went out of the west door of the jail, going out into the hall or large room that led into the jailer's office and downstairs. I did not see the other two negroes any more till they were brought back after they were caught, but the defendant soon after this, that is, within a few minutes, returned into the jail and went to where Mr. Coberly lay. He had a pistol in his right hand, cocked, and he caught hold of Coberly's coat tail and raised up his coat and pointed the pistol between Mr. Coberly's shoulders, as if he was going to shoot him. We white prisoners were only a few feet away, but we were on the inside of the cell and he was on the outside, and we could do nothing. I called to the defendant and said, 'Don't shoot him; you have already killed him.' The defendant then looked into the face of Coberly and said, using some oaths and bad language, 'Yes, he is dead,' and did not shoot. He then took some keys from the person of deceased, I think from his hip pocket, and went out, and I did not see him any more till he and the other negroes were brought back to the jail some half hour later. The defendant, at the time he came down the steps following the body of the deceased, had no hat on and his pants were rolled up. I observed that the top of his head had been shaved and the hair on the back and sides of his head had not. I think that Arthur Gilmore's head had been clipped all over, but it had not been shaved and was not as short in any part as the defendant's. The way defendant's hair had been shaved gave him somewhat the appearance of being bald-headed. There was nothing peculiar about the hair of Will

Miller (the other negro). I saw the defendant as he was brought in jail, and knew him to be the negro that came downstairs after Mr. Coberly when he fell, and the same negro that struck the deceased the two blows with the stick, and who pointed the cocked pistol at him and got the keys when the defendant and the other two negroes come downstairs and went in the direction of the jailer's office. I did not see the other two negroes any more, as I have already stated, till they were all brought back. Just a moment before the defendant returned into the jail with the pistol in his hand, Guy Starks, a negro 'trusty,' who assisted the jailer about the jail, and who usually stayed in the jailer's room or some of the front rooms (insane or hospital room), came into the jail room where we were in the cages and where Mr. Coberly lay, and walked up near where he was, as if he was going to raise him up or do something for him. About that time defendant came to the door leading into the cell room, with the pistol in his hand, and I told Guy Starks to look out. Guy Starks ran around north and east towards the east end of our cells and out of my sight, and from where I was Guy was not in my sight again until the defendant again went out towards the office, and then Guy came back near Coberly and stood by a window looking in the direction of a window in the jailer's room that is at the head of the stairs. He pretty soon ran out of the jail, and I did not see him any more till the crowd came in and lifted Mr. Coberly up and carried him out of the jail room."

Between the time of the murder and defendant's being placed on trial therefor, Guy Starks, the negro "trusty," mentioned in the testimony of Otho Williams, had been tried and acquitted for the offense for which he was in jail, and he testified as a State's witness on this trial. He identified the defendant and corroborated the testimony of Williams. After the three men had escaped from the jail he is the party who gave the alarm and was instrumental in having them arrested in a very few minutes after their escape.

O. E. Boyd testified, that at the request of counsel, during a recess of court, he took the stick which had been identified as the one with which Coberly was killed, and weighed it, and that it weighed one pound and eleven ounces; that he measured it, and it was twenty-two inches long and one and one-half inches in diameter at the big end; that it was about two inches in diameter a little ways from the big end, where there was a knot. It was a rough blackjack stick forked at the small end.

W. E. Durbin, constable, testified that he was one of the parties who arrested the prisoners, after their escape, and took them back to jail. That at the jail he saw the blackjack stick with the blood stains on it, which he identified in court. On the evening after the killing he took the defendant, George Henry, on the train to Fort Worth for safe keeping. That defendant wanted to talk about the case; that he warned him that any statement he might make might be used as evidence against him, after which defendant stated that he struck deceased, Coberly, with the stick; said he did not aim to hit him as hard as he did. He further stated that he had the stick with which he hit Coberly concealed in his bunk or

bed for about three weeks. That neither Arthur Gilmore nor Will Miller asked the defendant no questions to draw out any statement, but he seemed anxious to tell all about it, and did so.

Defendant also made a confession to W. S. Fry, city marshal of Denton, after Fry had also warned him; and his confession to Fry was also the same in substance as that to Durbin.

The testimony of the two physicians, who were called to see the wounded man before his death, stated that he died from blows inflicted upon him with some blunt instrument. The back part of the skull, on the left side, was badly crushed and broken. There was an indentation in the crushed part of the skull which penetrated deeper than the depressed portion around it, and showed that there was a projection of some sort on the instrument with which he had been struck that had penetrated the brain.

One of the main issues presented for the defense was that defendant was under 17 years of age, and therefore not liable to capital punishment under the law.

Arena Carter, his mother, testified that defendant's name was Grant Carter, and that he would be 17 years old on the 23d day of August, 1897. The prosecution contradicted this testimony by her deposition, which was taken in Oklahoma March 18, 1897, in which she stated that he would be 16 years old next August.

Defendant, as a witness in his own behalf, swore that he was not yet 17 years old; that he would be 17 years old next August. He swore that Will Miller was the party who killed Coberly, the deceased, with the stick, and that Gilmore and Miller had threatened to kill him if he did not confess that he had killed him. He denied that he had stated to Tom Bell, the sheriff of Hill County, or to Dave Jones, his deputy, that he was 19 or 20 years of age.

One or two of the State's witnesses testified positively to the fact that defendant was born in 1877, and Emmett Alexander, one of these witnesses, testified that he had recorded defendant's birth in a little book, at the request of his mother, shortly after his birth.

Tom Bell, the sheriff of Hill County, and David Jones, his deputy, both testified that while the three negroes were in their custody, in Hill County, under the charge of burglary, and after the defendant had been warned by Bell, the sheriff, defendant had stated that he was 19 years of age. They stated that this statement was made in the presence of Sam Hawkins, the sheriff of Denton County, and Hawkins, being recalled by the State, testified to the same facts.

[No briefs for appellant have come to the hands of the Reporter.]

*Mann Trice,* Assistant Attorney-General, for the State.—It appears that appellant was confined in the jail of Denton County on the charge of burglary. That on the 23d day of February, 1897, the deceased, who was acting as jailer, went upstairs where appellant and several other per-

knew anything about it until he had struck Coberly. Witness said he sons were confined. It seems that on account of appellant's claim of being sick he was permitted the liberty of the run-around, his cell not being locked. He had a stick of wood concealed in his bunk, and knocked the deceased down with it and beat him over the head, from the effect of which wounds he died in a few hours. Defendant then liberated two other prisoners and they made their escape from the jail, but were recaptured within a short time. On motion of appellant, the venue was changed to Wise County. However, appellant was arraigned before the change of venue and pleaded not guilty to the indictment. Appellant denies striking the fatal blow, and alleges that one of his companions did so. This story, however, is improbable.

1. When appellant was arraigned he failed to suggest that he was not indicted by his true name. It was therefore proper to refuse to allow him to do so after arraignment and plea. Code Crim. Proc., art. 548; Negro Ben v. State, 9 Texas Crim. App., 107; Pancho v. State, 25 Texas Crim. App., 402; Dugger v. State, 27 Texas Crim. App., 95.

Under the proof there can be no question as to his identity, and as presented no error is shown.

2. The absent testimony as to the age of appellant appears to be merely cumulative; that is, seeking to show that at a certain time in 1894 he was a small boy, wearing knee pants. No other specific reason or fact is stated by which it could be inferred that he was under the age of 17. In view of the positive testimony that he was born in August, 1877, and his confession made at Hillsboro that he was 19 years old, there is no probable truth in the absent testimony, or that if the same were adduced, the result would be different on another trial.

3. Appellant was properly warned by Fry and others to whom he confessed. It is true that Fry asked him, "Who struck deceased?" and he replied, "I did." It does not appear that any of the other parties to whom he confessed asked him any questions at all, and the confessions were all made at different times to different parties. Fry asked him who struck deceased, and he replied, "I did." This did not render the confession involuntary, as there was no coercion or hope of favor or reward.

4. Appellant was properly warned by Sheriff Tom Bell before he made the statement as to his age in Hillsboro. True, he was not indicted for this offense at the time he made the statement. He was afterwards indicted, and when he interposed as a defense his nonage, any declaration or statement that he may have made at any time, from which his age could be fixed or determined, was clearly admissible.

The charge of the court considered as a whole presents the law applicable to the facts in the case.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death; hence this appeal.

Appellant was indicted under the name of George Henry. On the trial he suggested that his name was Grant Carter, and not George Henry,

and that the prosecution proceed against him in his true name. The court refused to change the name and appellant excepted. In explanation of the bill, the·court states that defendant had been arraigned under the name of George Henry, and entered a plea of not guilty under said name before the order changing the venue to Wise County was made and entered. The time for defendant to have moved the court that the prosecution proceed against him in his true name, as alleged by him, was on his arraignment; and article 548 of the Code of Criminal Procedure of 1895 expressly provides that, if it is not then done, the name by which ·he is indicted shall be taken as his true name, and he shall not thereafter be allowed to deny the same by way of defense. This would seem to indicate that, if the suggestion is not made opportunely on arraignment, the suggestion thereafter made comes too late. See Wilcox v. State, 31 Texas, 586.

Appellant presented a motion for a continuance, which was overruled ·by the court, and he assigns this action of the court as error. He claims .a continuance on account of the absence of Bob Young, Minnie Carter, Adeline Coble, Ed. Wheeler, and Martin McCoy. As to Ed. Wheeler, he was present, and testified on the trial; so he is eliminated. The application shows that appellant relied on the State's process for Bob Young; that the State had had process issued for him to Denton County, and that it was returned that day, showing that said witness was not in Denton County, but in Grayson County. It was alleged that Minnie Carter and Adeline Coble lived in Tarrant County, and that the process was duly served on them on March 7, 1897; that, as to Martin McCoy, he resided in Cass County, and that an attachment was issued for him on March 6, 1897, and the same was duly served on March 9, 1897. It is not shown how said process was served. The application only states they were served, and we are left to conjecture as to how said service was made. But assuming that they were properly attached, and placed under bond to make their appearance at the District Court of Wise County, which began on May 24, 1897, and adjourned on July 14, 1897, there appears a total lack of diligence in procuring the attendance of these witnesses. If they were not present when court met on the 24th of May, or some day set apart for taking up the criminal docket, the·defendant was at once entitled to an attachment; and the application utterly fails to show anything in regard to these witnesses except that they were served in March, and that they were not present on the day the application for continuance was made, which was on June 28, 1897. We can not assume, in the absence of a showing, that said witnesses were present during that term of the court, and only made default on the day said case was tried. The bill should have shown such attendance, and when said witnesses made default, in order that we might judge intelligently of the diligence used. In regard to the witness Young, appellant proposed to prove by him that he was in the jail, in cell No. 1 (being the same cell in which one Otho Williams was confined, who testified for the State), when the homicide occurred; and he proposed to contradict by said· Young some of the ma-

terial facts stated by the State's witness Otho Williams. When the motion for a new trial on the ground stated in the motion for a continuance was presented to the court, the State had procured the affidavit of said Bob Young, which affidavit showed said witness agreed with and would corroborate Otho Williams in every material particular. It was competent for the State to pursue this course, and this affidavit shows that said witness would not only not serve the purpose of the defendant, but would be a very material witness against him.

The application shows that the defendant expected to prove by the witnesses Minnie Carter and Adeline Coble that they have known the defendant since he was a small child, and that he was not 17 years of age in February, 1897. It will be noted that the above does not contain any distinct statement of facts, but merely the conclusions of said witnesses in the most general terms. How small defendant was when they first knew him (except as stated, that he was a small child), is not shown. The means of information of said witnesses is not stated; and we are not informed who Minnie Carter and Adeline Coble are, and what their opportunities were of knowing the age of defendant. In other words, the testimony is stated (if it can be called testimony) in the most general terms, and it would be exceedingly difficult to predicate perjury upon such allegations. We make the same observation in reference to the testimony of Martin McCoy, by whom it was stated that appellant expected to prove that he worked with him in 1894, and that defendant was then a small boy, wearing knee pants. The age of the defendant was made an issue in the trial. On this question appellant introduced his mother, and his sister, Pinkie, and Ed. Wheeler. These witnesses do not testify with any degree of clearness as to the defendant's age. Rena Carter, defendant's mother, stated that he would be 17 years old on August 23, 1897, which would make the date of his birth August 23, 1880. She furnished no written data, nor did she allude to any in her testimony, and it was shown that she had testified on a former occasion (evidently in reference to this case), and made his birth August 23, 1881. Appellant's sister, Pinkie, who was shown to be older than he, was more indefinite than the mother was in her testimony touching this point. She says that some two years before the homicide she cooked for Mr. Pierce in Gainesville, and that her brother (defendant) came there, and stayed some time; that he was a small boy, and wore knee pants, but she did not know how old the defendant was; that he was larger now than he was then. Ed. Wheeler, her husband, testified to the same effect, only he stated that appellant was then wearing long pants. The State on this issue proved by Verner that when appellant was born he was a near neighbor of his father; that he (witness) was then about grown; that appellant, whose name is Grant Carter, was born in the summer of 1877, and he relates facts that impress this upon his memory. One fact is that the child was named Grant, which was an unusual name in the South at that time; that he was born the same year that General Grant retired from the office of President, and that the baby was named for him. Emmett Alexander testified that

he was a near neighbor of the father of Grant Carter when appellant was born, in Parker County; that Rena Carter, the mother of appellant, had a litttle book in which she kept a record of the births of her children, and that she, not being able to write, got witness to record the births of several of her children, among others, that of Grant Carter, who was born in August, 1877, and also of Hayes, her next child; that he remembered the incidents from the fact that he made a record of it, and because it was the first child that he knew to be called for General Grant. He also stated as another reason for his remembering the age of the child Grant that he had a boy named Sterling, who was born in March 1877, and the defendant being born in August, 1877, it would only make about six months difference in the ages of the two children. John Osborn, another witness, testified that he also was a neighbor to Steve and Rena Carter when the defendant, Grant Carter, was born; that he had a distinct recollection that Grant was born in 1877. Tom Bell, sheriff of Hill County, and his deputy, Dave Jones, both testified that appellant was in jail in Hill County on a charge of theft, and that his codefendants, Will Miller and Arthur Gilmore, were also in jail on the same charge; that appellant proposed to plead guilty, and to exonerate his codefendants; that it occurred to him that possibly his purpose was to go to the reformatory, and that he warned him, and questioned him as to his age; that appellant stated to them that he was then 19 years of age. This testimony on the part of the State gives data and events which render it almost absolutely, certain that appellant was about two years over 17 years of age when he committed the homicide; and it does not occur to us that, if it be true that the witnesses, on account of whose absence the motion for a continuance was made, would testify as therein alleged in general terms, the jury would believe them, or that their evidence would conduce in any wise to change the result as to the age of appellant.

There is nothing in the matter suggested in appellant's third bill of exceptions. He was duly warned before he made the statement. The warning was not more than hour before the statement was made, and there is no suggestion that appellant had forgotten the same, or that it was not operating upon his mind at the time he made the statement. He was in charge of the same officer who gave the warning. There was no error in this action of the court. Nor was there any error in admitting the testimony of the witnesses Tom Bell and his deputy Jones, as to the statement made to them by the defendant in regard to his age, who was duly warned before he made this statement. Although his arrest was in another case, and the statement made by him was not in the nature of a confession relative to this case, it was, however, the statement of a fact made to the officers after he had been duly warned, and we see no reason why such statement was not admissible. The statute, of course, has relation to confessions, and provides that they shall not be admissible when a party is in jail, unless he has been duly warned. We do not understand this to exclude any statement that can be used in evidence against a defendant in any other case, provided such statement or dec-

laration was made under the conditions guarantied by the statute. We understand the statute to refer to confessions as such, but we do not construe it to exclude other statements, not in their nature confessions; and we hold that when a defendant under arrest has been duly warned, and he makes a statement, that such statement can be used in any case in which he is then under arrest, or in any other case, if the statement involves a material fact, and is otherwise admissible in evidence. The statement of his age, made to these officers, is of no fact conducing to his guilt on the charge of homicide; but was purely a collateral matter, not admitting his guilt of anything, but simply a statement of his age. It was made after due warning, and is admissible in evidence in any case in which the question of his age may arise. The court did not err in excluding the testimony of the witnesses Lawrence Jones, Lewis Beeville, and Allie Edwards, by whom it was proposed to prove that they were larger than the defendant, and that neither of them was over 16 years of age. This testimony could certainly not serve as a test or criterion as to the age of the defendant. Nor was there any error in that part of the charge of the court contained in paragraph 11, about which appellant complains. We understand the court to submit in said charge the issue to the jury as to whether or not said stick of wood was a deadly weapon or instrument calculated to produce death in the manner in which it was used; and certainly this charge, taken in connection with paragraph 17 of said charge, places the matter of intent on the part of the defendant, in connection with the instrument used, clearly before the jury. Paragraph 17 is as follows: "The instrument or means with which a homicide is committed are to be taken into consideration in judging of the intent of the party offending. If the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless, from the manner in which it was used, such intent evidently appears."

Appellant also complains of the action of the court in overruling his motion for a new trial on the ground of newly-discovered evidence. We have examined the same, and we can not regard the evidence as either material or as newly-discovered. We have given the record in this case a careful consideration, and find no errors. The jury inflicted the highest penalty known to the law, and, in our opinion, the evidence amply warrants their finding. There is no question that the homicide was committed by appellant for the purpose of effecting his escape from the jail. He slew an officer, who, on account of his real or feigned sickness, had been kind to him in allowing him indulgences not accorded to other prisoners. The killing was carefully planned, and carried out with a degree of deliberation and brutality that has few parallels in its atrocity.

We see no reason for disturbing the verdict of the jury, and the judgment is affirmed.

*Affirmed.*

HURT, Presiding Judge, absent.