## R. L. FURNACE V. THE STATE.

### No. 3874.　Decided January 12, 1916.

### Rehearing denied February 9, 1916.

**1.—Murder—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence sustained the conviction, there was no reversible error.

**2.—Same—Continuance—Want of Diligence.**

· Where the defendant's application for a continuance showed a want of diligence, and no affidavit was attached to the motion for a new trial showing that the absent witness would testify to the facts alleged in the application for continuance, and the testimony of the absent witness would not probably be true if it corresponded with the allegations in defendant's application, the same was correctly overruled. Following Stacy v. State, recently decided.

**3.—Same—Rule Stated—Diligence—Motion for Continuance.**

It is the settled law of this State that a defendant is not entitled to a continuance as matter of right, the truth of his application as well as the merits thereof are addressed to the sound discretion of the trial court, and the defendant must affirmatively show that he has used due diligence to procure the attendance of his claimed absent witness.

**4.—Same—Rule Stated—Continuance—Diligence.**

Diligence in securing the attendance of the witness is in the highest degree essential and the continuance should invariably be refused when the want of diligence amounts to pure negligence. Greenwood v. State, 9 Texas Crim. App., 638, and other cases.

**5.—Same—Rule Stated—Statute Mandatory.**

The law requires of the defendant a rigid compliance with the exact terms prescribed for such application, and if there is a lack of diligence, apparent from the application, or otherwise, its mandate is inexorable and the trial must proceed. Following Skipworth v. State, 8 Texas Crim. App., 135.

**6.—Same—Rule Stated—Onus on Defendant.**

The law does not require the State to show a want of diligence in opposition to a continuance, the onus is upon the defendant to show himself entitled to it by definite, exact and certain averments. Following Long v. State, 17 Texas Crim. App., 128.

**7.—Same—Rule Stated—Application for Continuance—Presumption—Inference.**

.  Neither this nor the trial court will supply by inference or presumption allegations not contained in the application for continuance; the application must be complete within itself, and the presumption, if indulged, will and must be in favor of the rulings of the court. Following Massie v. State, 30 Texas Crim. App., 64, and other cases.

**8.—Same—Case Stated—Want of Diligence.**

Where the application for continuance showed no diligence whatever to procure the absent witness, a motion for a new trial should be overruled and where defendant made no application for process until more than three weeks after he was indicted, and assigned no reason why process was not sooner issued or show when the absent witness temporarily left the State, or that he did not know that the witness was not going to be absent, his application was insufficient. Following Dove v. State, 36 Texas Crim. Rep., 105.

**9.—Same—Discretion of Court—Rule Stated.**

Before a new trial will be granted it must appear that the facts set forth in the application for a continuance were of a material character and probably

true, and the truth, merit and sufficiency of the application are therefore matters addressed to the sound discretion of the trial court. Following Abbrigo v. State, 29 Texas Crim. App., 143.

### 10.—Same—Rule Stated—Testimony Not Probably True.

An application for a continuance will be held to be properly overruled when, in connection with the evidence adduced on the trial, it is apparent the proposed absent testimony would not be probably true, and this court will not reverse a judgment unless, in connection with the other evidence adduced on the trial, it is impressed with the conviction, not merely that the defendant might probably have been prejudiced in his right by the refusal of such continuance, but that it was reasonably probable that if the absent testimony had been before the jury a verdict more favorable to the defendant would have resulted. Following Stacy v. State, supra.

### 11.—Same—Argument of Counsel—Bills of Exception.

Where the argument of State's counsel presented no reversible error, there was no error. Following Mooney v. State, 176 S. W. Rep., 52, and other cases.

### 12.—Same—Motion for New Trial—Viewing Scene of Homicide—Defendant's Failure to Testify—Opinion of Juror.

Where defendant's motion for new trial alleged that the jury viewed the scene of the homicide; that some of the jurors alluded to defendant's failure to testify, and that one of the jurors was prejudiced against the defendant, but the record showed that the State contested this motion alleging that all of these grounds were untrue, and it was evident from the record that the court overruled the motion after hearing testimony thereon, which testimony was not disclosed in the record, there was no reversible error.

Appeal from the District Court of Bell. Tried below before the Hon. John D. Robinson.

Appeal from a conviction of murder; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*J. H. Evetts* and *J. F. Hair,* for appellant.—On question of overruling motion for continuance: Weaver v. State, 52 Texas Crim. Rep., 11, 105 S. W. Rep., 189; Leonard v. State, 53 Texas Crim. Rep., 187, 109 S. W. Rep., 149; Sharp v. State, 61 Texas Crim. Rep., 247, 134 S. W. Rep., 333; Perez v. State, 87 S. W. Rep., 350; Kelly v. State, 33 Texas Crim. Rep., 31; Barlow v. State, 61 Texas Crim. Rep., 64, 133 S. W. Rep., 1050.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of overruling motion for continuance: Bronson v. State, 59 Texas Crim. Rep., 17, 127 S. W. Rep., 175, and cases stated in opinion.

On question of argument of counsel: Howard v. State, 53 Texas Crim. Rep., 378; Graham v. State, 57 id., 104; Lane v. State, 59 id., 595.

PRENDERGAST, Presiding Judge.—Appellant was convicted of the murder of Charlie White, and his punishment assessed at life imprisonment.

There is practically no conflict in the testimony on any material issue in the case. Every material fact is established by uncontroverted tes-

timony. Whatever conflict there is is merely of some incidental matter, which did not affect the case materially one way or another.

For several years prior to this homicide appellant was a partner in the saloon business in Belton and lived in Belton with his family. He was about his saloon almost continuously while he was a proprietor thereof, though he did very little, if anything, in running it. During all these years he was a continuous and heavy drinker, so much so that in April, two years before this homicide in July, 1915, he was afflicted because thereof with delirium tremens. While this spell was on him he was crazed thereby. The doctors at the time treated him for delirium tremens and soon got him in a condition where, as they say, they sent him to Marlin to be treated with hot water, and this treatment boiled the whisky out of him. He got over the delirium tremens, and thereafter was a changed man so far as his drinking and drunkenness was concerned. He realized the effect that his drinking had upon him and as soon as he returned from Marlin sold out his interest in the saloon and quit that business. He thereupon moved some distance from Belton to the country on his farm and farmed thereafter. It appears that from this time on he never drank any.

He and Mr. White, the deceased, lived near neighbors in the country and had been acquainted with one another for a long time. Mr. White represented him in some trade and thereupon claimed a commission from appellant. This was the cause of an estrangement between them, and some hostility was engendered by appellant against Mr. White. Shortly before the killing a yearling belonging to another was seen in appellant's pasture. It disappeared at such a time and in such a way as to lead to suspicion and perhaps some talk or inference that appellant had stolen the animal. Appellant was informed of this rumor or talk. He thereupon presumably armed himself and hunted up Mr. Russell, who had inquired of him for the yearling but who did not get it. Appellant found Russell in Russell's field and told him that he had come to settle with him, forbade him to come closer to him, put his hand in his shirt bosom and told him that he had been accused of being a cow thief and had not heard it until the day before, and the effect of his accusation at the time was to accuse Russell of having made said accusation against him. It seems that Russell satisfied him at the time that he had made no such accusation. He thereupon inquired what White, deceased, had said about it. Among other things, he told Russell at the time that he had once been prosecuted for horse theft, and said as he left Russell he would find the son-of-a-bitch that started that joke. He then suspected White was the man who was instrumental in having such accusation of the theft of the yearling rumored against him. It was shown that a few days before the killing appellant passed back and forth in front of Mr. White's residence, apparently looking for him, but Mr. White was not at home at the time.

Mr. Warren, a deputy constable at Belton, testified that some days before the killing appellant came to him and asked for Mr. Messer, the constable for whom he was deputy, and then told him, Warren,

that, if anything happened out where he lived to tell Hugh Smith, the sheriff, not to be uneasy—that he would answer. Mr. Walker testified that some days before the killing he was going to town with appellant and talked to him about the rumor that he had stolen said yearling; that this seemed to rile him, and after talking about it some time appellant said: "I will kill the son-of-a-bitch that started it." Mr. Hemphill, one of appellant's witnesses, on cross-examination, testified that about thirty minutes before the killing he had a talk with appellant, wherein appellant told him that he had gone down to kill one man about the rumor that he had stolen said yearling, but that that man came clean with him and he did not kill him, and that another man had lied to him about it.

For a short time before the killing the deceased was shown to have been standing on the sidewalk in front of a saloon in Belton talking with friends, and that appellant is placed in such a position as would show that he saw and knew that White was there. The evidence clearly shows, however, that White knew nothing about the proximity of appellant. The testimony then shows that appellant approached deceased from out in the street, or square, going directly towards deceased. All the testimony shows that appellant fired his pistol twice at deceased, the second shot immediately following the first. Mr. Walker testified that at the time of the first shot he had just walked up to deceased and was shaking hands with him; that they had their right hands clasped in this greeting, and that he had his left hand on deceased's right shoulder, and that at the time the first shot was fired deceased was looking at the witness. Mr. Springer testified that he was standing in the company with White at the time, and as appellant walked up he, Springer, went to shake hands with appellant, but appellant said: "Step back, boys, I want to kill that son-of-a-bitch," and immediately fired the first shot at White. That the witness threw up his hand, struck appellant's pistol, knocked it up so that the first shot went wide of its mark and above the door. Mr. Tarrant, who was one of the company about White at the time, testified that the first shot was what attracted his attention; that appellant said nothing to Mr. White before he heard the first shot, and then, just after he fired the first shot appellant said to White: "It is you I am after"; that at this time Mr. White was going from appellant, running into the saloon; and that then appellant deliberately grasped his pistol with both hands and shot White in the back after he had gotten into the saloon, from which he very soon died.

Appellant's sole defense was that he claimed he was insane at the time. It was shown, and not disputed, that the only time appellant was insane was in April, some two years before the killing, when he had a spell of delirium tremens. The undisputed testimony shows that, upon treatment by the doctors and the boiling out at Marlin, he was cured of delirium tremens and never thereafter was so afflicted and never at any time was insane. Dr. McElhannon and appellant's brother-in-law, Dr. Alsup, were shown to have been his family physicians from

the time he was afflicted with delirium tremens, and no one else is shown to have been his physician during that time, or that of his family. Some six months before the killing appellant had a little son to die, to whom he was much attached. When the child first became sick the other members of his family wanted him to call in a physician, but he refused, thinking the child was not sick enough for that. The child growing worse, however, he later consented to send for a physician, and did so, sending for his family physician, Dr. McElhannon, and his brother-in-law, Dr. Alsup. They at once advised him of the very serious illness of his child, and that they thought it would result fatally. It did so result very soon. Appellant became much depressed on the loss of this child and the remorse that he had because he did not sooner send for a physician, or consent that be sent for, blaming himself and expressing himself that, if he had done so in time, the child probably would not have died.

Appellant not only introduced as his witnesses the said Dr. McElhannon, but also Mr. J. F. Alsup, his father-in-law, Mrs. Kelso, his daughter, Dr. Alsup, his brother-in-law, his wife, his brother, Jim Furnace, another grown daughter, and his sister on the question of his claimed insanity. Not a single one of them would testify that he was insane, and not a single one of them did testify that he was insane.

The State had Dr. Barton, an expert physician, present, who heard all of the testimony on the issue of insanity, and he swore: "If the symptoms which the witnesses testified to have been proven, and if the jury believe these symptoms existed and were true, in my opinion there is no evidence in this case that shows that the defendant was insane at the time he committed the act." On cross-examination, he said that from his actions, as told about by the witnesses, he would say that appellant was not insane; that he came to his conclusion after he heard all the facts.

Appellant made a motion for a continuance on account of the absence of Dr. Batte, a resident of Bell County, but who was not present and who had not been subpoenaed. He alleged in his motion that Dr. Batte had been his physician for a number of years and, if present, would testify that about two years before, and for a considerable length of time, appellant's mind was totally deranged, and that at times since then, up to and immediately preceding the homicide, he was subject to illusions and hallucinations and at times irresponsible for the acts he committed, and that, if appellant was greatly worried or subjected to grief or sorrow, his reason would be dethroned, and he would temporarily be insane.

In the recent case of Stacy v. State, 77 Texas Crim. Rep., 52, we had occasion to fully investigate and discuss the question of the diligence which must be used by an accused to entitle him to a continuance. We can do no better than to here copy what we there said, which is the law of this State. It is:

"It is the settled law of this State, both by statute and all the decisions, that an accused is not entitled as a matter of right to a con-

tinuance; that the truth of his application therefor, as well as the merits of the ground and its sufficiency, is addressed to the sound discretion of the trial court. It is also statutory, as well as in accordance with the decisions, that before an accused can get a continuance he must affirmatively show that he has used due diligence to procure the attendance of his claimed absent witness.

"Judge White says: 'Diligence in securing the attendance of a witness is in the highest degree essential; and the continuance should invariably be refused when the want of diligence amounts to pure negligence. Greenwood v. State, 9 Texas Crim. App., 638.' Sec. 600, White's Ann. C. C. P.

" 'Continuance is properly refused always where there is a want of diligence. O'Neal v. State, 14 Texas Crim. App., 582; Hart v. State, 14 Texas Crim. App., 657; Childers v. State, 16 Texas Crim. App., 524; Hawkins v. State, 17 Texas Crim. App., 593 (50 Am. Rep., 129); Timbrook v. State, 18 Texas Crim. App., 1; Barrett v. State, 18 Texas Crim. App., 64; Bond v. State, 20 Texas Crim. App., 421; Moseley v. State, 25 Texas Crim. App., 515 (8 S. W. Rep., 652); Stegall v. State, 32 Texas Crim. Rep., 100 (22 S. W. Rep., 146, 40 Am. St. Rep., 761); Underwood v. State, 38 Texas Crim. Rep., 193 (41 S. W. Rep., 618); Henry v. State, 38 Texas Crim. Rep., 306 (42 S. W. Rep., 559).'

"This court, in Skipworth v. State, 8 Texas Crim. App., 135, said: 'The law requires of the defendant a rigid compliance with the exact terms prescribed for such applications, and if there is a lack of diligence, apparent from the application or otherwise, . . . its mandate is inexorable and the trial must proceed.'

"In Walker v. State, 13 Texas Crim. App., 618, 44 Am. Rep., 716, note, this court said: 'We know of no rule of law which requires the State to show a want of diligence in opposition to a continuance. It devolves upon the defendant to show, affirmatively and distinctly, that he has used all the diligence to obtain his witness required by law.'

"In Long v. State, 17 Texas Crim. App., 128, this court said: 'The onus is upon the defendant to establish the exercise of diligence in support of an application for a continuance. . . . The burden is upon the party seeking a continuance to show himself entitled to it by definite, exact and certain averments.'

"In Massie v. State, 30 Texas Crim. App., 64, 16 S. W. Rep., 770, this court said: 'Neither will this court nor the trial court supply by inference and presumption allegations not contained in an application for a continuance which should be stated therein. The application must be complete within and of itself in order to require this court to say it was erroneously refused. Presumption, when indulged, will and must be in favor of the rulings of the court in reference to the matter complained of, and not against same.' "

There can be no question but that this record clearly shows that appellant used no diligence whatever to get this witness and is not entitled to a new trial because a continuance was refused him. He killed deceased on July 10, 1915. He was at once arrested. The grand

jury returned an indictment against him July 22nd. He made no application for process for Dr. Batte until August 14th, more than three weeks after he was indicted. Neither his application nor his bill show any reason why process was not sooner issued for this witness. He does not show when this witness left Belton for California, but he alleges that he left "on or about the — day of ——, 1915." He does not show that he did not know that he was going to leave at any time. Hence, the court committed no error in overruling his motion for a continuance, because no diligence whatever was shown to have been used by him to procure the attendance of Dr. Batte

Again, Judge White, in section 599 of his Ann. C. C. P., says: "An application for continuance must state the residence of the witness; and when it states that a witness is temporarily absent it should state how long he had been so absent, and when he left the county of his residence. Dove v. State, 36 Texas Crim. Rep., 105 (35 S. W. Rep., 648); Vanwey v. State, 41 Texas, 639; Wolf v. State, 4 Texas Crim. App., 332; Thomas v. State, 17 Texas Crim. App., 437; Colton v. State, 7 Texas Crim. App., 50. Where the application for continuance did not show at what time the defendant ascertained that the witness was a resident of the county to which he had a second attachment issued, the diligence was insufficient. Hughes v. State, 18 Texas Crim. App., 130."

Again quoting from the Stacy case, supra: "Our continuance statute (C. C. P., art. 608) further provides that, when an accused's application for a continuance is overruled, 'if it appear upon the trial that the evidence of the witness . . . was of a material character, and that the facts set forth in said application were probably true, a new trial should be granted.'

"As stated, said statute and the decisions, are to the effect, as thus stated by Judge White:

" 'The truth, merit and sufficiency of an application therefor are matters now addressed to the sound discretion of the trial court. Abrigo v. State, 29 Texas Crim. App., 143 (15 S. W. Rep., 408).' Sec. 620.

"So that the court, in acting upon the motion for a new trial because of the overruling of appellant's applications for a continuance, must consider, and we, of course, must presume he did, whether a new trial should be granted under all of the facts of the case.

"Under such circumstances, among others, Judge White lays down these rules: 'An application for continuance will be held properly overruled, when, in connection with the evidence adduced on the trial, it is apparent that the proposed absent testimony would not be probably true. . . .' Sec. 643.

" 'The court on appeal will not revise or reverse the judgment of the lower court refusing a continuance or postponement, and the overruling of the motion for new trial based upon the application for continuance or postponement, unless it is made to appear by the evidence

adduced at the trial that the proposed absent testimony was relevant, material, and probably true. . . .' Sec. 647.

" 'The court on appeal will not reverse a judgment on account of the refusal of a postponement or continuance unless in connection with the other evidence adduced on the trial they are impressed with the conviction, not merely that the defendant might probably have been prejudiced in his rights by such ruling, but that it was reasonably probable that if the absent testimony had been before the jury a verdict more favorable to the defendant would have resulted. . . .' Sec. 647, par. 2."

In quoting what Judge White states as the rules just above, we have omitted the cases he cites thereunder. They are all cited in the Stacy case, so that it is needless to again cite them here. We think there can be no question but that under the facts and circumstances of this case the court in no event committed any error in overruling appellant's motion for a continuance, nor in denying his motion for a new trial because thereof. The trial judge no doubt concluded that Dr. Batte would not testify as appellant alleged he would, and, even if he would have, his testimony would not probably be true. Appellant did not procure any affidavit from Dr. Batte and attach it to his motion, showing that Dr. Batte would swear what he alleged he would.

Appellant has two bills to very short excerpts from the prosecuting attorney's argument before the jury. Neither of these present any reversible error. Bass v. State, 16 Texas Crim. App., 62; Pierson v. State, 18 Texas Crim. App., 524; House v. State, 19 Texas Crim. App., 227; Tweedle v. State, 29 Texas Crim. App., 586; Mooney v. State, 76 Texas Crim. Rep., 539, 176 S. W. Rep., 52. A great many other cases might be cited, but it is unnecessary.

He attacked the verdict of the jury on three grounds. One was he claimed that the jury panel passed and some of them viewed the scene of the homicide and saw the place where the deceased and the defendant respectively stood when appellant fired the shots and noticed the door and transom where the bullet went through the glass. His second attack was he claimed that some of the jurors mentioned and discussed the fact that appellant had not testified. And his third attack was that one of the jurors, Mr. Collier, was not competent in that he was biased and prejudiced against appellant and had so expressed himself before taken, etc. The State vigorously contested appellant's motion on these grounds, and each of them, alleging that each of said grounds, in whole and in part, were untrue and tendered proof in support of the denial. It is evident that the court heard testimony when acting on said motion for new trial. What that testimony is the record does not disclose. Hence, under the well settled rule, we are bound to conclude that the trial judge was clearly justified in refusing a new trial on either and all of said grounds. We see no necessity of discussing this question nor again collating the authorities. We have often done so.

There is no reversible error presented in this record. We have thor-

oughly considered the case and the questions presented. The judgment will be affirmed.

*Affirmed.*

[Rehearing denied February 9, 1916.—Reporter.]