### ALBERT BYRD. v. THE STATE.

#### No. 1799. Decided November 2, 1898.

**1. Continuance.**

Where the residence of the proposed absent witness in an application for continuance is stated to be unknown, and it does not appear that he was ever known in the county, and his whereabouts are unknown; that process issued to several counties for him has been returned "not found," after search to secure his attendance, and that defendant's counsel is the only person professing to be acquainted with him; Held, the application was properly refused.

**2. Same.**

An application for continuance is properly refused where it is shown that at least twenty days before the trial defendant knew that the witness was residing with her parents in Arkansas and no effort whatever has been made to secure her deposition.

**3. Same—When Sought for a State's Witness.**

Where a defendant proposes to use a State's witness, he should make the fact known and join in the process issued by the State for said witness. He should certainly make his intention to use the witness known prior to his application for a continuance, so as to avoid any question as to his good faith in the premises.

**4. Improper Argument of Counsel—Practice on Appeal.**

A case will not ordinarily be revised on appeal because of denunciatory remarks of counsel for the prosecution, unless a charge on the subject was asked and refused by the court. But district judges should adopt stringent measures to prevent such practice, too often resorted to in the courts.

**5. Murder—Manslaughter—Charge.**

On a trial for murder, where there was evidence to the effect that shortly before the homicide the wife of deceased made an assault upon defendant and struck him repeatedly with a whip, and that her husband, deceased, was present at the time aiding her by acts and encouraging her by gestures, a charge upon manslaughter was insufficient which wholly failed to instruct the jury that the assault made by the wife, in which deceased aided and encouraged her, would be an assault by him, and might be adequate cause to reduce the offense to manslaughter; and it was error to refuse a requested instruction asked to that effect.

APPEAL from the District Court of Milam. Tried below before Hon. W. G. TALIAFERRO.

Appeal from a conviction for murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The indictment charged appellant with the murder of L. C. Alexander, on the 12th day of July, 1897.

The case is sufficiently stated in the opinion.

*R. Lyles, A. P. Taylor,* and *J. E. Yantis,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years; hence this appeal.

The court overruled appellant's motion for a continuance, to which he

reserved his bill of exceptions. The motion was predicated on the absence of one John Nevils and Miss Eveline Wilder. The residence of John Nevils is stated to be unknown, and he is described as an Irishman and a day laborer, and it is alleged that he was present at the homicide, within sixty feet of the defendant and deceased at the time of the shooting; that he would testify, if he were present, that the defendant was walking up Belton Street, and Alexander (deceased) was sitting on the south platform of the San Antonio & Aransas Pass depot in said town of Cameron, and, when defendant got opposite to deceased, deceased stood up and raised a stick in a striking attitude towards the defendant, and that defendant then shot him. The diligence used for this witness was by issuing process to Milam, Bexar, Williamson, McLennan, Falls and Robertson counties, all of which was returned "Not found." In connection with this witness, it does not appear that he was known in Milam County. So far as the record discloses, R. Lyles, one of the attorneys in the case, is the only person about Cameron, or in that vicinity, who professed to be acquainted with this man Nevils. His whereabout in the application is stated to be unknown; and the whole country including the surrounding counties has been searched to secure his attendance. He was not only not found, but no suggestion is made by the officers that he has been in either of said counties. No doubt the court below thought he was either a fictitious person, and that it was not at all likely that his presence could ever be secured at the trial, or that, if present, he would testify as stated in the application. We do not believe the court erred in overruling the application on account of the absence of this witness. As to the witness Miss Eveline Wilder, it occurs to us that the least effort on the part of appellant would have ascertained her residence to be in the State of Arkansas. Certainly, he was charged with notice that she was with her parents at Spadra, in said State of Arkansas, at least twenty days before his trial, by the return indorsed on the process returned by the sheriff of Bexar County. And yet during all this time no effort whatever was made to procure her deposition. We would also state in this connection that it does not appear that there was any intention on the part of appellant to use this witness prior to his motion for a continuance. The State had process issued for her to San Antonio, but defendant does not appear to have joined therein. If defendant proposed to use the State's witness, he should certainly make his intention known prior to his application for a continuance, in order that there be no question as to his good faith in the premises. Where, however, he does not make the fact known that he desires said witness, he will not be allowed to complain of the State's lack of diligence to secure the attendance of such witness. Looking at the record in this case, we consider it exceedingly improbable that the witness would testify as is claimed by appellant.

On the trial of the case appellant reserved a bill of exceptions to certain remarks of J. C. Scott, the district attorney, denunciatory of the defendant. Among other things, he applied to him the epithets "assassin," "murderer," "vulture," and also went out of the record to state "that it

might be the law at Waco, where they are now shooting down men like they were dogs, to shoot a man down because his wife had horsewhipped him; but it was not the law in Milam County." It appears that the court reprimanded the district attorney, and told him to confine himself to the record. No special charges were asked by the appellant on this subject, and none were given. Under the rule laid down by this court, a case will not ordinarily be reversed because of denunciatory remarks made by the district attorney, unless a charge on the subject is asked, and refused by the court. While the case will not be reversed on this ground, yet we again reiterate our condemnation of this vicious practice. It is neither proper, much less praiseworthy, for the district attorney to abuse a defendant who is utterly helpless, as far as he is concerned, to resist such attack when on trial before the jury. District judges should adopt stringent measures to prevent this practice, too often resorted to in the courts.

Appellant complains of the action of the court in refusing to give the special instruction requested by him on the subject of manslaughter. In order to present this issue fairly, we will quote substantially so much of the evidence and charge of the court as bears on this subject. The homicide appears to have been occasioned by an altercation that occurred between defendant, deceased, and his wife, at the residence of the deceased, between fifteen and twenty minutes preceding the killing. Deceased and his wife lived on Belton Street, about two blocks west of the Aransas Pass depot, in the city of Cameron. With them lived their daughter, Miss Florence Maddox, a young lady about 15 years of age; and at the time Miss Eveline Wilder, a young lady about 17 years old, whose home was in Arkansas, was visiting them. Appellant and his brother, Cleburne Byrd, lived with their parents, just across the street from the deceased. Defendant at the time was running an ice cream parlor about four or five blocks from his residence, east from the Aransas depot. The killing occurred immediately in front of and south of the Aransas depot on Belton street, between 12 and 1 o'clock at night. It appears that about 8 o'clock on the night of the homicide appellant and one Will English met the two young ladies, and were taking a walk. The proposition was made to go to a camp meeting, about six miles in the country. Miss Maddox objected, because she said her mother would not permit her to go. They agreed, however, to go and see Mrs. Alexander to gain her consent for the young ladies to go to the camp meeting. They went to the residence of the latter, and met deceased and his wife there, about 9 o'clock. They refused to permit the young ladies to go to the camp meeting, stating that their daughter was too young to go out with young men, and it was too late, and the camp meeting was too far out. On further importunity Mrs. Alexander consented that the young men might take the girls to a meeting that was going on in the city of Cameron, but to bring them immediately back home. The parties—defendant with Miss Wilder and English with Miss Maddox—immediately left the residence of the deceased, and went to the ice cream parlor of appellant; the young ladies in the meantime having consented to go to the camp meeting.

Miss Maddox stated that she would explain the matter to her mother the next morning. The young men went to the livery stable, and procured buggies, and carried the young ladies to the camp meeting. Just before getting to the camp ground, they met the people returning to town, and English and Miss Maddox turned back, stating that it was not necessary to go further, that the meeting had broken up. Appellant and Miss Wilder, however, proceeded to the camp ground, then turned back, and subsequently overtook the other parties, and all came into Cameron together, arriving there about 12 o'clock. It was suggested, after arrival by the young ladies, that the buggies had better be put up, and they walk home, in order to allay suspicion that they had been to the camp meeting. This was accordingly done. The young ladies remained at the ice cream parlor in the meantime. English and Miss Maddox, on the way home, walked in advance of the other two parties. When they got to the gate they discovered the deceased, Alexander, and his wife, were up, sitting on the gallery. They came out to the gate, meeting the parties. English did not go in, as, from the bearing of Alexander and his wife, he apprehended trouble. The State's testimony shows at this point that Mrs. Alexander immediately began whipping her daughter. Nothing was done to English, as he did not come in at the gate, but immediately left. English, however, states that deceased (Alexander) struck at him over the fence with what he took to be a shotgun. He dodged the blow, and immediately ran back; that on the way he met appellant and Miss Wilder, and told appellant not to go down there, as there was trouble in the air. Appellant and Miss Wilder, however, proceeded on to the gate. The State here shows by the witness Mrs. Florence Alexander and her daughter, Miss Florence Maddox, that Mrs. Alexander was just outside of the gate at the time these parties came up, and that Alexander was with Miss Maddox, close to the steps of the house, inside the yard; that just before Byrd got to the gate he turned off to leave. And Mrs. Alexander testified as follows: "I then said to him, 'Wait a minute, Mr. Byrd. Give an account of yourself.' I said, 'Where have you been with these girls so late?' He replied, 'We have been riding around, having a good time.' I said, 'Didn't I tell you you could not carry the girls off?' He replied, 'I have not hurt your God-damned girls.' I then hit him with the whip, and began whipping him. I did this because he used this language. I did not intend to whip him when I went out, but intended to whip the girls. When I hit him with the whip, he said 'Stop that.' I hit him several times; do not know how many. During this time Alexander was trying to get to me, and the little girl was hugging around him, tussling with him. Alexander finally got to me as I raised the whip the last time; and grabbed the whip out of my hand, and said: 'Stop that, Florence. This is scandalous. I am ashamed of you.' Byrd walked off, when Alexander grabbed the whip out of my hand. Alexander made no attempt to strike Byrd, either with the whip or with anything else, at any time. When Alexander had grabbed the whip, he went at once back in the yard, and into the house. As Byrd walked off, he remarked to me, 'God damn

you, I will fix you before morning.' We went into the house, and nothing further was said or done." Appellant himself testified as to the circumstances immediately attending this difficulty, as follows: "English and Miss Maddox were ahead of Miss Wilder and myself. When I got nearly to the Alexander house, Mr. English came running by us, going towards town. He said, 'For God's sake, don't go up there; there's trouble in the air.' I decided that it was my duty to deliver the young lady home. She was scared, and I thought it would be treating her badly to abandon her in the street; so we just went on. When we got some little distance from the gate that goes into the Alexander yard, Alexander came out and said to me, 'Do you consider yourself a man?' Miss Wilder ran, and got in the yard, when Mrs. Alexander was whipping Miss Maddox. I said, 'Yes, I consider myself a man.' He said, 'You are a God damned cur,' and hit me with his fist in the head, then struck me with a club he had in his hand. Mrs. Alexander then came out, and whipped me with a buggy whip. She struck me a number of licks. I do not know how many; somewhere between ten and twenty. A part of the time she was whipping me, Alexander was holding me. He was a very large man, and I am very small. I am 31 years old, and weigh about 140 pounds. Mrs. Alexander and Mr. Alexander both cursed me. He did not try to stop her from whipping me. He did not take the whip from her, or offer to do so. I pulled away from them, and left." The brother of the appellant, who states that he was across the street, in full view of the parties, testified on this point substantially as did the appellant. The killing, as stated before, occurred between fifteen to thirty minutes after this altercation at Alexander's house. Alexander being a switchman at the Aransas depot, and the train coming in about 1 o'clock, shortly after the altercation he left his home, and went to the depot, which was about two blocks east, and was sitting on the south side of the passenger platform, talking with one W. L. Burton in regard to the loss of a trunk. Defendant and his brother in the meantime had left their home, and gone down to the ice cream parlor, for the purpose, as they state, of getting his pistol, as he apprehended another attack on him by the deceased. On their way home from the ice cream parlor, they passed near where deceased and Burton were sitting on the platform. The testimony for the State here shows that when defendant got opposite to where they were sitting, and about fifteen feet from the platform, he and his brother stopped. Appellant put his head forward, and looked at Alexander, the deceased, and at the same time drew from his pocket a pistol, and said, "You damned son of a bitch, I have got you now," and fired. After he fired the first shot, he "sorter" played around the deceased, and fired the second shot. "Deceased was in the act of falling when he fired the second shot. I [Burton] then said to the defendant, 'Don't shoot him any more; you have already killed him;' and the defendant said, 'He beat me up once to-night, and he is not going to do it again.' Defendant and his brother then walked off in the direction of town." J. R. King, who states that he was sitting on the same platform, further east, coincides in the main with the

witness Burton as to the circumstances attending the killing. Defendant and his brother state the circumstances somewhat differently: That, as they passed near where the parties were sitting on the platform—perhaps within three feet of them, Cleburne walking next to the platform—just as they got opposite to Alexander, he rose up with a stick in his hand; that he had the stick grasped by one end with both hands. As Alexander rose up, Albert halted and drew his pistol, and said, "You damn son of a bitch, I've got you now," and he immediately fired. Alexander advanced a step or two, and fell. As he fell, Albert fired at him the second shot. "I then said to him, 'Bud, don't shoot any more, but go surrender to the officers,' and we started to go. When Alexander rose before he was shot, he held the stick in a striking attitude,—that is, he had it grasped by one end by both hands, and had the other end off the ground, and raised away from his body, as though he intended to strike with it; but Albert did not give him time. He shot too quick to allow him to strike. I did not see Alexander make any effort to strike, because I had passed on, not expecting there would be any trouble." Albert Byrd (appellant) stated: "That at the time we first saw them, we were about seventy-five feet from them, and we were going west down Belton Street. We continued in the direction we had started until we got within about fifteen feet of them [deceased and Burton]. I looked at Alexander, and saw he had a stick. He arose, and raised his stick in a striking attitude, and I shot him. I started to shoot him again, and did shoot a second time; but, as I saw him falling, I threw the pistol up and caused it to miss him. Some one said, 'Don't shoot any more.' My brother said, 'Come on, and give up to the officer,' which I did. When I shot Alexander, I thought he intended to beat me up again with the stick, which was large enough that he could have killed me with it. When he was sitting down on the platform he had the stick between his legs, and his lantern at his side. He arose, holding the stick in both hands by one end, and raised the other end off of the ground, and held it out from him in a striking attitude. He had not gotten entirely straight when I shot him, but nearly so. I thought he was going to strike me, and I said, 'You damned son of a bitch, I have got you now,' or 'I have got an even break with you now,' or something of that kind. I was very much excited at the time." There was other evidence in the case, showing that a stick was found on the ground near where the homicide was committed, about three inches through one way and about one inch through the other, and about three feet long.

On this state of case, the court gave a charge on murder in the first and second degrees, manslaughter, and self-defense. The charge on manslaughter, so far as applicable to the question here raised, is as follows: "Manslaughter is voluntary homicide, committed under the immediate influence of sudden passion, arising from an adequate cause, but neither justified nor excused by law. (1) The act must be directly caused by the passion arising out of the provocation. (2) The passion intended is either of the emotions of the mind known as anger, rage, sudden resentment, or terror, rendering it incapable of cool reflection. (3) By the expression

'adequate cause' is meant such as would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. In order to reduce a voluntary homicide to the grade of manslaughter, it is necessary, not only that adequate cause existed to produce the state of mind referred to,—that is, of anger, rage, sudden resentment or terror, sufficient to render it incapable of cool reflection,—but also that such state of mind did actually exist at the time of the commission of the offense. You are further instructed that the following are also deemed adequate causes: (1) An assault and battery by the deceased, causing pain. (2) Any condition or circumstance capable of creating, and which does create, sudden passion, such as anger, rage, sudden resentment, or terror, rendering the mind for the time incapable of cool reflection, whether accompanied by bodily pain or not; and in this connection is applicable only to the phase of the law of manslaughter presented in this subdivision of the court's charge. You are instructed that the provocation causing the sudden passion must arise at the time of the killing, or must have been so recent, and so strong, that sufficient time had not elapsed for the mind of the slayer to cool, and for him to deliberate upon the character of the act before the killing takes place; and, although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty, in determining the adequacy of the provocation (if any), to consider, in connection therewith, all the facts and circumstances in evidence in the case; and if you find that by reason thereof the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law; and so, in this case, you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the alleged killing, and the adequacy of the cause (if any) producing such condition. If you believe from the evidence, beyond a reasonable doubt, that the defendant killed L. C. Alexander by shooting him with a pistol, and that the killing was not done in self-defense; and you further believe and find from the evidence that prior to the killing the said Alexander committed an assault and battery upon the defendant, causing pain; that such assault and battery created in the mind of defendant sudden passion, such as anger, rage, sudden resentment, or terror, which rendered him at the time incapable of cool reflection; that such assault and battery was so recent, and the passion caused thereby was so strong, that such sudden passion existed at the time of the killing, and rendered the defendant's mind incapable of cool reflection,—if you so believe, you will find him guilty of manslaughter. Or should you believe, from the evidence, that prior to the killing, at or near the house of L. C. Alexander, the said Alexander cursed and abused the defendant and made an assault or an assault and battery (whether accompanied by bodily pain or

not) on the defendant; that the acts done and the words spoken by said Alexander were capable of creating, and did create, in the mind of the defendant sudden passion, such as anger, rage, sudden resentment, or terror, that rendered him for the time incapable of cool reflection; and that such provocation was so recent, and the passion caused thereby was so strong, that such passion existed at the time of the killing, and rendered the defendant's mind incapable of cool reflection,—if you so believe, you will find him guilty of manslaughter. Or should you believe, from the evidence, that prior to the killing, at or near the house of L. C. Alexander, the said Alexander cursed and abused the defendant, or that he cursed and abused the defendant and made an assault or an assault and battery (whether accompanied by bodily pain or not) on the defendant; that subsequently, at the time of and before the killing, the said Alexander made an assault on the defendant, or did any act which, alone or when coupled with the previous words and acts of said Alexander, were capable of creating, and did create, in the mind of defendant sudden passion, such as anger, rage, sudden resentment, or terror, which for the time rendered him incapable of cool reflection, and that while laboring under such sudden passion, he shot and killed said Alexander; and you further believe from the evidence, beyond a reasonable doubt, that such assault or acts done by said Alexander (if any) at the time were not such as to constitute an unlawful and violent attack on the defendant, made in such manner as to produce a reasonable expectation or fear of death or serious bodily injury,—you will find the defendant guilty of manslaughter. If you believe from the evidence, beyond a reasonable doubt, that the defendant killed L. C. Alexander as charged, and that the same was not done in self-defense; and you further believe from the evidence that at the time of the killing the defendant was laboring under such a transport of passion, produced by either or all of the adequate causes explained and submitted to you in the preceding charges, or caused by any other condition or circumstance in evidence which was capable of creating, and which did create, such sudden passion as rendered the mind of the defendant incapable of cool reflection at the time of the killing,—you will find the defendant guilty of manslaughter."

The charge requested by appellant, which was refused by the court, is as follows: "If you believe from the evidence that Florence B. Alexander was the wife of Lawson C. Alexander, and that the said Florence B. Alexander committed an assault and battery upon the defendant with a whip, in the street near the residence of said Lawson C. Alexander, on the night of July 12, 1897, and that the said Lawson C. Alexander was present at the time and place and where the assault and battery was committed upon the defendant by Florence B. Alexander, and the said Lawson C. Alexander knew of the unlawful intent of the said Florence B. Alexander, and that he aided her by acts or encouraged her by gestures to commit said assault upon the defendant, then the said Florence B. Alexander and Lawson C. Alexander were principals in said assault,

and the said Lawson C. Alexander was as much responsible for said assault as if he had committed it alone and unaided by his wife, the said Florence B. Alexander."

Now, the question arises whether or not the charge of the court on the subject of manslaughter, as applicable to the facts proven, was full enough; in other words, was there a phase of the case not covered by the court's charge, and which the requested charge did cover? It is urged that the court's charge to the effect that any condition or circumstance capable of creating, and which does create, sudden passion, such as anger, etc., rendering the mind incapable of cool reflection, etc., is sufficiently comprehensive to cover all the points at issue, and to authorize the jury to find the defendant guilty only of manslaughter, if they believe that the assault was committed by Mrs. Alexander, and not by him. And it is further insisted that the jury would know, without an instruction to that effect, that an assault committed by Mrs. Alexander, when he was present, aiding and encouraging her in such assault, would be an assault by him as a principal, and that the charge as given was sufficient without charging specifically on the doctrine of principals in connection with an assault committed by Mrs. Alexander. The first contention might be correct if the court's charge had been general. For instance, if the court had charged, if they believed appellant had been assaulted at the house of Alexander by them, which caused his mind to be excited, and sufficient cooling time had not elapsed, and he subsequently killed deceased, he would only be guilty of manslaughter. But such was not the charge of the court. The charge, as given, confined the adequate cause to an assault and battery by the deceased, causing pain; and then predicated throughout the charge on manslaughter an assault made by deceased, L. C. Alexander. The jury would naturally conclude from this that they could only consider, with reference to adequate cause, an assault made on appellant by L. C. Alexander, and not by his wife. If there was no controversy in the record as to an assault being made by L. C. Alexander at his house on appellant, then, of course, the charge given would not be misleading. Appellant, in his testimony, claims that both L. C. Alexander and his wife assaulted him, deceased participating actively in such assault; indeed, that he began it. If the State's testimony concurred with this, there could be no possible error. But, as we understand it, the State's evidence controverts this proposition. Mrs. Alexander and her daughter both testify that she alone made the assault on appellant with the buggy whip, that deceased did not participate in said assault, and that she alone committed the assault. For aught that we know, the jury may have believed this version of the affair. The charge, however, circumscribed and limited them to an assault made by the deceased, and we are nowhere told that the assault made by the wife of the deceased, which he aided and encouraged, would be an assault by him, and might be adequate cause to reduce the offense to manslaughter. We believe the charge as given eliminated adequate cause superinduced by an assault made on appellant by the wife of the deceased, in which he joined by acts or words, and re-

stricted them solely to an assault made on appellant by deceased. They may not have believed the testimony of the appellant and his brother on this point, but may have believed the testimony of the wife and daughter of the deceased, or a part of that testimony, and a part of appellant's testimony. If they believed the latter, they were restricted by the court's charge from giving appellant the benefit thereof. Under the facts and circumstances of this case, we believe the requested charge ought to have been given, and for the refusal of the court to give the same the judgment is reversed and the cause remanded.

*Reversed and remanded.*

HURT, Presiding Judge, absent.

### ADDITIONAL OPINION.

#### November 18, 1898.

HENDERSON, JUDGE.—In the opinion delivered in this case at a former day of this term, in connection with the witness Nevils, for whom a continuance was sought, this language is found: "In connection with this witness, it does not appear that he was known in Milam County. So far as the record discloses, R. Lyles, one of the attorneys in the case, is the only person about Cameron or in that vicinity who professed to be acquainted with this man Nevils. His whereabouts in the application is stated to be unknown; and the whole country, including the surrounding counties, have been searched to secure his attendance." It will be noticed that in this opinion the statement is made that "R. Lyles, one of the attorneys in the case, is the only person about Cameron or in that vicinity who professed to be acquainted with this man Nevils." Since the rendition of this opinion, it has been called to our attention that this is not a correct and full statement of the record in this connection; and, after a careful examination of the record, we find that this portion of the opinion incorrectly states the record on this point. The witness Thomas Ford testified on the trial as follows: "I live in Cameron, Texas. Have lived there many years. I knew John Nevils. I saw him in Cameron about the time of the killing of L. C. Alexander. I saw him several times. He was an Irish laborer. I do not know where he is now. I think he was a sort of a tramp." It may be further stated in this connection that the record also discloses that Terry saw Lyles talking to some one; and, in a conversation with Lyles in regard to that person, Lyles stated to Terry that it was Nevils to whom he was talking. For two reasons we desire to file this additional statement, to be considered along with the opinion in this case. First, to correct the opinion in regard to the statement that Lyles was the only witness who professed to be acquainted with Nevils; and, second, to correct any wrong impression that may be gathered from the opinion itself in regard to the witness Lyles. We make this correction in order to conform the opinion in the case to the record, and in order that no injustice may be done to the parties mentioned.