## Lee Stacy v. The State.

### No. 3425.   Decided April 21, 1915.

Rehearing denied June 2, 1915.

**1.—Murder—Continuance—Want of Diligence.**

Where, upon trial of murder, the application for a continuance showed a want of diligence on the part of the defendant to apply and have issued process for the alleged absent witness, there was no reversible error in overruling same. Davidson, Judge, dissenting.

**2.—Same—Discretion of Court—Continuance—Not Matter of Right.**

The accused is not entitled as a matter of right to a continuance; the truth of his application therefor, as well as the merits of the ground and its sufficiency is addressed to the sound discretion of the trial court, and he must affirmatively show due diligence.

**3.—Same—Rule Stated—Diligence—Negligence.**

Diligence in securing the attendance of a witness is in the highest degree essential, and a continuance should invariably be refused when the want of diligence amounts to pure negligence. Following Greenwood v. State, 9 Texas Crim. App., 638, and other cases.

**4.—Same—Rule Stated—Diligence—Burden on Defendant.**

No rule of law requires the State to show a want of diligence in opposition to a continuance; it devolves upon the defendant to show affirmatively and distinctly that he has used all the diligence required by law to obtain his witness. Following Walker v. State, 13 Texas Crim. App., 618, and other cases.

**5.—Same—Rule Stated—Presumption.**

Neither this court nor the trial court will supply by inference or presumption allegations not contained in an application for continuance which should be stated therein; the application must be complete in itself. Following Massie v. State, 30 Texas Crim. App., 64.

**6.—Same—Process by State—Diligence, When.**

The fact that a subpoena had been issued for the absent witness by the State upon which the defendant based his application for continuance is not sufficient diligence, in the absence of a showing that said witness had already been served with a subpoena, and even then upon application to the trial judge, the defendant or his attorneys could have had another subpoena issued for this same witness. Davidson, Judge, dissenting.

**7.—Same—Setting Case for Trial—Knowledge of Defendant.**

The defendant and his attorneys can not claim as an excuse for not applying for the issuance of a subpoena for the alleged absent witness on the ground that they did not know that the court had set the case for trial on a certain date; they are presumed to know, and the slightest diligence would have informed them.

**8.—Same—Want of Diligence—Residence of Witness.**

Where the application for continuance did not show at what time the defendant ascertained that the witness was a resident of the county to which he claimed process issued, the diligence is insufficient. Following Hughes v. State, 18 Texas Crim. App., 130, and other cases.

**9.—Same—Process by Opposite Party—Want of Diligence.**

While either party may avail himself of process issued for witnesses by the opposite party, the party relying for a continuance thereon must be able to show that diligence was used by the opposite party, and where, as in the

instant case, this was not shown there was no reversible error. Following Mixon v. State, 36 Texas Crim. Rep., 66, and other cases. Davidson, Judge, dissenting.

### 10.—Same—Immateriality of Testimony—Testimony Probably Not True.

The truth, merit and sufficiency of an application for a continuance are matters addressed to the sound discretion of the court, and where the alleged absent testimony was not of a material character and probably not true, there was no error in overruling defendant's application for a continuance. Following Carver v. State, 36 Texas Crim. Rep., 552, and other cases. Davidson, Judge, dissenting.

### 11.—Same—Rule Stated—Motion for New Trial.

The court on appeal will not revise or reverse the judgment of the lower court refusing a continuance or postponement unless it is made to appear in the motion for new trial that by the evidence adduced at the trial the proposed absent testimony was relevant, material, and probably true. Following Koller v. State, 36 Texas Crim. Rep., 496, and other cases.

### 12.—Same—Rule Stated—Motion for New Trial.

Unless the motion for new trial shows in connection with the overruling of the motion for a continuance that defendant might reasonably procure a different result on the trial of the case by reason of the absent testimony, there is no reversible error. Following Land v. State, 34 Texas Crim. Rep., 330, and other cases.

### 13.—Same—Case Stated—Continuance.

Where it appeared from the record on appeal that the trial judge could have correctly concluded that the absent witness would not testify as defendant alleged he would, and that even if he did, his testimony in that respect would not be probably true, no reversible error is presented in overruling defendant's motion for a continuance. Davidson, Judge, dissenting.

### 14.—Same—Evidence—Husband and Wife—Cross-examination.

Where, upon trial of murder, it became a material question whether the open knife which was found upon the body of the deceased some time after he was killed was defendant's knife, and defendant introduced his wife as a witness, whose testimony tended to show that it was not defendant's knife, there was no error in permitting the State, on cross-examination of the wife, to examine her with reference to this matter.

### 15.—Same—Threats of Deceased—Evidence—Cross-examination of Defendant's Wife.

Where, upon trial of murder, defendant's wife testified to a threat by the deceased against the defendant, there was no error in permitting the State on cross-examination to show that the defendant and the deceased had made up and were friendly after said alleged threats. Following Roberts v. State, 74 Texas Crim. Rep., 150.

### 16.—Same—Argument of Counsel—Bill of Exceptions—Practice.

Where defendant complained of the remarks of State's counsel that the court refused to permit him to object to the language of State's counsel at the time it was being uttered, but required him to wait until the speech was completed, but the bill was so qualified that this contention was incorrect and that counsel was not required to wait, etc., there was no reversible error. Davidson, Judge, dissenting.

### 17.—Same—Evidence—Threats—Requested Charge.

Where, upon trial of murder, the testimony of the State's witnesses showing threats by the defendant against the deceased were clearly admissible to

show the motive, malice and intent of the defendant, there was no reversible error, and there was no error in the court's failure to charge the jury not to consider said testimony.

. 18.—Same—Charge of Court—Self-defense—More Than One Assailant.

Where, upon trial of murder, the evidence showed that immediately prior to the time when defendant killed the deceased that his brother did not say or do anything showing an attack or any contemplated attack upon the defendant, there was no error in the court's failure to charge upon the question of more than one assailant, the defendant's testimony showing that the deceased alone made an attack upon him when he shot him, which was controverted by the State's testimony. Davidson, Judge, dissenting.

Appeal from the District Court of Hill. Tried below before the Hon. Horton B. Porter.

Appeal from a conviction of murder; penalty, ninety-nine years imprisonment in the penitentiary.

The opinion states the case.

*D. Moore* and *Taylor & Forrester* and *Morrow & Morrow,* for appellant.—On question of diligence of the defendant where State has issued .subpoena: Mixon v. State, 36 Texas Crim. Rep., 66; Byrd v. State, 39 id., 609; McMillan v. State, 66 Texas Crim. Rep., 288, 146 S. W. Rep., 1190; Valigura v. State, 68 Texas Crim. Rep., 12, 150 S. W. Rep., 778.

Upon question of materiality of absent testimony: Asken v. State, 47 Texas Crim. Rep., 362.

On question of court's charge in failing to charge on self-defense on the doctrine of more than one assailant: Stacy v. State, 48 Texas Crim. Rep., 95; Roberts v. State, 48 id., 378; Arnwine v. State, 50 id., 254; Darnell v. State, 58 id., 585; Gant v. State, 55 Texas Crim. Rep., 284, 116 S. W. Rep., 801.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of want of diligence of defendant's motion for continuance: Long v. State, 17 Texas Crim. App., 128, and cases cited in opinion.

On question of immateriality of testimony: Westerman v. State, 53 Texas Crim. Rep., 109, and cases cited in opinion.

On question of probable truth of testimony: Rocquemore v. State,. 54 Texas Crim. Rep., 592, and cases cited in opinion.

On question of charge of more than one assailant: Mitchell v. State,. 38 Texas Crim. Rep., 170.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of the murder of his seventeen-year-old stepson—the son of his wife,—and his punishment assessed at ninety-nine years in the penitentiary.

These persons and many others were attending a dance. The killing occurred about midnight May 7, 1914. It was a bright, cloudless, moonlight night, with the moon about full. The parties were out in the open a short distance from the house with quite a number of per—

sons out there in sight and in hearing. The State introduced three eye-witnesses. Appellant introduced no eyewitness except himself. His defense was self-defense. The testimony by the State makes a clear case of murder and disproved appellant's defense. His testimony alone would tend to show self-defense. We see no necessity of reciting the evidence.

Appellant's main contention seems to be the claimed error of the court in overruling his motions for a continuance for the absence of Lum Hardin, which we will first discuss.

In order to properly discuss this question we will state the law and the evidence applicable thereto. In doing this no reflection is intended upon appellant or any of his attorneys. We merely discuss the question and the evidence as developed by the record.

The record herein and of this court show that the justice of the peace at Aquilla, in Hill County, near where the homicide occurred, the next day thereafter, held an examining trial, upon which he denied appellant bail and properly committed him to the custody of the sheriff of the county; that several days thereafter he applied to the district judge for a writ of habeas corpus, which was granted, and upon hearing by the district judge, he, on June 1, 1914, denied bail and likewise properly remanded appellant to the custody of the sheriff. Appellant appealed from this judgment of the district judge to this court, which affirmed the judgment (168 S. W. Rep., 1199), all thereby showing that it was a murder case, in which the death penalty might likely be inflicted, of which, of course, appellant and all of his attorneys had knowledge. Appellant has been confined in jail at Hillsboro, the county seat of Hill County, continuously from the time the justice of the peace first denied him bail. The grand jury of Hill County duly indicted him September 17, 1914, at the term of court for said county, which began on the first Monday in September. He was duly served with a copy of the indictment on September 23rd. In due time, as was customary, the judge set the criminal docket. On September 25, the judge set this case for trial for October 19th and ordered a special venire for that date. The special venire must have been for quite a number of veniremen.

Two of appellant's attorneys, Messrs. Morrow & Morrow, lived at Hillsboro. Judge Morrow of this firm, however, was at Austin in attendance on the State Senate, of which he was a member, until October 15, 1914; two others, Messrs. Taylor & Forrester, at Waco; Mr. Forrester said they relied on Mr. Moore to procure process for witnesses; and the other, Mr. Moore, lived at Aquilla, some sixteen or eighteen miles southwest from Hillsboro, in Hill County, near which the homicide occurred. Appellant at no time personally applied for any process whatever for any witness. The first time that any of appellant's attorneys applied for process was on October 14, 1914,—nineteen days after the case had been set for trial and the special venire ordered, and only four days, exclusive of the day on which the process was issued and the case set for trial, before the case was to be tried.

It is the settled law of this State, both by statute and all the decisions, that an accused is not entitled as a matter of right to a continuance; that the truth of his application therefor, as well as the merits of the ground and its sufficiency, is addressed to the sound discretion of the trial court. It is also statutory, as well as in accordance with the decisions, that before an accused can get a continuance he must affirmatively show that he has used due diligence to procure the attendance of his claimed absent witness.

Judge White says: "Diligence in securing the attendance of a witness is in the highest degree essential; and the continuance should invariably be refused when the want of diligence amounts to pure negligence. Greenwood v. State, 9 Texas Crim. App., 638." (Sec. 600, White's Ann. C. C. P.)

"Continuance is properly refused always where there is a want of diligence. O'Neal v. State, 14 Texas Crim. App., 582; Hart v. State, 14 Texas Crim. App., 657; Childers v. State, 16 Texas Crim. App., 524; Hawkins v. State, 17 Texas Crim. App., 593; Timbrook v. State, 18 Texas Crim. App., 1; Barrett v. State, 18 Texas Crim. App., 64; Bond v. State, 20 Texas Crim. App., 421; Moseley v. State, 25 Texas Crim. App., 515; Stegall v. State, 32 Texas Crim. Rep., 100; Underwood v. State, 38 Texas Crim. Rep., 193; Henry v. State, 38 Texas Crim. Rep., 306."

This court, in Skipworth v. State, 8 Texas Crim. App., 135, at p. 139, said:

"The law requires of the defendant a rigid compliance with the exact terms prescribed for such application, and if there is a lack of diligence apparent from the application or otherwise, its mandate is inexorable and the trial must proceed."

In Walker v. State, 13 Texas Crim. App., 618, at p. 647, this court said:

"We know of no rule of law which requires the State to show a want of diligence in opposition to a continuance. It devolves upon the defendant to show affirmatively and distinctly that he has used all the diligence to obtain his witness required by law."

In Long v. State, 17 Texas Crim. App., 128, this court said:

"The onus is upon the defendant to establish the exercise of diligence in support of an application for a continuance. . . . The burden is upon the party seeking a continuance to show himself entitled to it by definite, exact and certain averments."

In Massie v. State, 30 Texas Crim. App., 64, this court said:

"Neither will this court nor the trial court supply by inference and presumption allegations not contained in an application for a continuance which should be stated therein. The application must be complete within and of itself in order to require this court to say it was erroneously refused. Presumption, when indulged, will and must be in favor of the rulings of the court in reference to the matter complained of and not against same."

The record herein shows that said witness Lum Hardin testified in

said examining trial on May 8th. A statement of his testimony was then made in writing, signed and sworn to by him. Appellant and some, if not all, of his attorneys knew this all the time.

Appellant made his first application for a continuance on October 19th when the case was called for trial. Up to that time his application and the record fails to show that he or any of his attorneys used any effort whatever to ascertain the whereabouts of said witness. Inferentially, at least, the record and said application indicate that neither appellant nor any of his attorneys made any effort whatever to locate said witness, or to aid or direct the officers where to find him. The record does not inform us who said witness Hardin is,—whether a young or an old man, married or single, permanently located or a transient. It simply shows that at the time of the homicide he resided in the neighborhood where it occurred. It does not show his business, occupation, or avocation.

The record and application show that for the first time, on October 14th, Mr. Moore, one of appellant's attorneys, applied to the clerk at that late date for a subpoena for said Hardin, and other witnesses; that the clerk at first included Hardin's name in the subpoena with the other witnesses, but then recalling that he had on September 30th, at the instance of the State, issued a subpoena for said witness, in which was included several others, he thereupon so informed Mr. Moore and erased Hardin's name from the subpoena. Mr. Moore acquiesced in this. The clerk was doubtless attempting to act under article 1577, P. C., which prescribes:

"It shall be unlawful for the clerk of any District Court, *after a witness in a felony case has been served with a subpoena* or an attachment, to issue any other or further process for said witness, except upon the order of the presiding judge, made upon application to him for that purpose. When a witness has been served with process by one party it shall inure to the benefit of the opposite party, in case he should need said witness; and, as far as practicable, the clerk shall include in one process the names of all witnesses for the State and defendant; and such process shall show that the witnesses are summoned for the State and defendant. Any district clerk who shall violate the provisions of this law shall be deemed guilty of a misdemeanor, and punished by a fine of not less than ten nor more than one hundred dollars."

It will be clearly seen by this that the clerk is forbidden to issue another subpoena for a witness only when that witness has already "been *served* with a subpoena." Even then, upon application to the judge, appellant or his attorneys could have had another subpoena issued for this same witness. Surely, the appellant and his attorneys are presumed to know this law and if they had not been satisfied then with the process that had been issued at the instance of the State for said witness, they should have applied to the judge and have procured another subpoena for him. It can not be held that appellant, under the circumstances, was deprived of process for his witness. If the clerk was mistaken, the appellant and his attorneys knew it. The law did

not prohibit him from getting another subpoena, unless he had actually been *served* with a prior subpoena. In this instance, he had not only not been *served* at that time, but was not *served* at any other time. Upon application to the judge, which would have taken practically but a short time, he could have secured another subpoena, if he wanted it, even if the witness had been served, but especially as he had not been served. Instead of resorting to the proceedings clearly authorized by law, he elected to abide by the process the State had had previously issued for the witness as a State's witness.

But it is claimed by appellant and his attorneys that they, and neither of them, knew that the court had on September 25th, set the case for trial on October 19th, and they claim that they nor either of them heard or knew of this until about the time Mr. Moore applied for said subpoena on October 14th. Instead of this being an excuse for not applying for process earlier, it but emphasizes the negligence in the premises and shows a total lack of diligence in even applying for process, much less having it served. They all knew the court was in session; they all doubtless knew that appellant had been indicted and served with a copy of the indictment on September 23rd; they all knew that almost necessarily the case must at once be set for trial and a special venire ordered and issued. By their own showing they knew that the docket for the trial of criminal cases would be set for the week earlier than October 19th or in no contingency later than October 19th. It was their business to know what the court was doing in open court about said case and the setting thereof. The slightest diligence by any or either of them, would have disclosed the knowledge of the setting of said case and the proceedings therein, if they had sought to obtain it. As shown, two of his attorneys were residents of Hillsboro, where the court was in session, though Judge Morrow was not there, as stated. The others lived at the points indicated. Everyone knows that the telephone, the telegraph and United States mails could be used any day, practically any hour of the day, to have ascertained these facts or any of them, but they failed to show that they availed themselves of any of these means to ascertain any of these facts, notwithstanding appellant, and they, knew that he would be tried at that term of court; that it was their business and duty to look after the case and prepare it promptly in his behalf for trial.

Again, Judge White, in sec. 599 of his Ann. C. C. P., says:

"An application for continuance must state the residence of the witness; and when it states that a witness is temporarily absent it should state how long he had been so absent, and when he left the county of his residence. Dove v. State, 36 Texas Crim. Rep., 105; Vanwey v. State, 41 Texas, 639; Wolf v. State, 4 Texas Crim. App., 332; Thomas v. State, 17 Texas Crim. App., 437; Colton v. State, 7 Texas Crim. App., 50. Where the application for continuance did not show at what time the defendant ascertained that the witness was a resident of the county to which he had second attachment issued, the diligence was insufficient. Hughes v. State, 18 Texas Crim. App., 130."

Again, Judge White, in sec. 602 of his Ann. C. C. P., says: "The fact that an absent witness desired by the defendant has been duly subpoenaed by the State does not dispense with such diligence as would entitle defendant to a continuance. Drake v. State, 5 Texas Crim. App., 649. Under provisions of article 1577, P. C., either party may avail himself of process issued for witnesses by the opposite party, but the party relying for a continuance on process issued by the adverse party must be able to show that diligence was used by such opposite party. . . . Mixon v. State, 36 Texas Crim. Rep., 66; Byrd v. State, 39 Texas Crim. Rep., 609."

Neither the applications nor the record otherwise show that the State used any diligence whatever to ascertain the residence or whereabouts of the witness Lum Hardin. All that is shown that the State did was simply and solely to have subpoena issued for him, as stated, and have it placed in the sheriff's hands. Apparently the State was indifferent about getting that particular witness. It seems to us the slightest diligence by the State ·even to ascertain the whereabout of said witness would have succeeded in doing so in ample time to have secured his attendance, and the appellant on October 14th, when he learned through his attorney that the State had had said process issued, could have then ascertained why he had not been served and made some effort to hunt him up in time to have him served.

We are clearly of the opinion that the lower court ruled correctly in overruling both of appellant's applications for a continuance because no diligence was used to secure the attendance of said witness.

In discussing and passing upon the action of the court in overruling said applications we have discussed the question as if the materiality of the testimony of Hardin in appellant's favor, was conceded. As a matter of fact, the State vigorously contends that the evidence of the absent witness, instead of being in favor of appellant would have been against him decidedly. As stated, a copy of his evidence at the examining trial is contained in the application for a continuance.

Our continuance statute (C. C. P., art. 608) further provides that when an accused's application for a continuance is overruled that "if it appear upon the trial that the evidence of a witness was of a material character and that the facts set forth in said application were probably true, a new trial should be granted."

As stated, said statute and the decisions, are to the effect, as thus stated by Judge White: "The truth, merit and sufficiency of an application therefor are matters now addressed to the sound discretion of the trial court. Abrido v. State, 29 Texas Crim. App., 143." (Sec. 620.) So that the court in acting upon the motion for a new trial because of the overruling of appellant's applications for a continuance must consider and we, of course, must presume he did, whether a new trial should be granted under all of the facts of the case. Under such circumstances, among others, Judge White lays down these rules:

"An application for continuance will be held properly overruled when, in connection with the evidence adduced on the trial, it is apparent

that the proposed absent testimony would not be probably true.   Carver
v. State, 36 Texas Crim. Rep., 552; Reyons v. State, 33 Texas Crim.
Rep., 143; McKinney v. State, 31 Texas Crim. Rep., 583; Brotherton v.
State, 30 Texas Crim. App., 369; Withers v. State, 30 Texas Crim.
App., 383; Leeper and Powell v. State, 29 Texas Crim. App., 63;
Wilks v. State, 27 Texas Crim. App., 381; Testard v. State, 26 Texas
Crim. App., 260; Peterson v. State, 25 Texas Crim. App., 70; Melton
v. State, 24 Texas Crim. App., 47; Parker v. State, 24 Texas Crim.
App., 61; Collins and Lindly v. State, 24 Texas Crim. App., 141;
Henning v. State, 24 Texas Crim. App., 315; Harvey v. State, 21 Texas
Crim. App., 178; Doss v. State, 21 Texas Crim. App., 505; Rice v.
State, 22 Texas Crim. App., 654; Murray v. State, 21 Texas Crim.
App., 466; Cunningham v. State, 20 Texas Crim. App., 162; Bond v.
State, 20 Texas Crim. App., 421; Mendiola v. State, 18 Texas Crim.
App., 462; Chandler v. State, 15 Texas Crim. App., 587; Henry v.
State, 38 Texas Crim. Rep., 306."

"The court on appeal will not revise or reverse the judgment of the
lower court refusing a continuance or postponement, and the overruling
of the motion for new trial based upon the application for continuance
or postponement, unless it is made to appear by the evidence adduced at
the trial that the proposed absent testimony was relevant, material, and
probably true.   Koller v. State, 36 Texas Crim. Rep., 496; Lindsley v.
State, 35 Texas Crim. Rep., 164; Moseley v. State, 35 Texas Crim. Rep.,
210; Tate v. State, 35 Texas Crim. Rep., 231; McGrath v. State, 35
Texas Crim. Rep., 413; Wilkins v. State, 35 Texas Crim. Rep., 525;
Waul v. State, 33 Texas Crim. Rep., 228; King v. State, 34 Texas Crim.
Rep., 228; Cline v. State, 34 Texas Crim. Rep., 415; Wyley v. State,
34 Texas Crim. Rep., 514; Neel v. State, 33 Texas Crim. Rep., 408;
Russell v. State, 33 Texas Crim. Rep., 424; Shaw v. State, 32 Texas
Crim. Rep., 155; Hyden v. State, 31 Texas Crim. Rep., 401; Brookin
v. State, 26 Texas Crim. App., 121; Browning v. State, 26 Texas Crim.
App., 432; Brooks v. State, 24 Texas Crim. App., 274; Jackson v. State,
23 Texas Crim. App., 183; Hennessey v. State, 23 Texas Crim. App.,
340; Covey v. State, 23 Texas Crim. App., 388; Rice v. State, 22 Texas
Crim. App., 654; Miller v. State, 18 Texas Crim. App., 232; Mathews
v. State, 17 Texas Crim. App., 472; Beatey v. State, 16 Texas Crim.
App., 421; Wooldridge v. State, 13 Texas Crim. App., 443; Word v.
State, 12 Texas Crim. App., 174; Clampitt v. State, 9 Texas Crim. App.,
27; Dowdy v. State, 9 Texas Crim. App., 292."

"The court on appeal will not reverse a judgment on account of the
refusal of a postponement or continuance unless in connection with the
other evidence adduced on the trial they are impressed with the con-
viction not merely that the defendant might probably have been preju-
diced in his rights by such ruling, but that it was reasonably probable
that if the absent testimony had been before the jury a verdict more
favorable to the defendant would have resulted.   Land v. State, 34
Texas Crim. Rep., 330; Gallagher v. State, 34 Texas Crim. Rep., 306;
Easterwood v. State, 34 Texas Crim. Rep., 400; Sinclair v. State, 34

Texas Crim. Rep., 453; Bluman v. State, 33 Texas Crim. Rep., 43; Goldsmith v. State, 32 Texas Crim. Rep., 112; Hyden v. State, 31 Texas Crim. Rep., 401; Hammond v. State, 28 Texas Crim. App., 413; Frizzell v. State, 30 Texas Crim. App., 42; Pruitt v. State, 30 Texas Crim. App., 156; Ellis v. State, 30 Texas Crim. App., 601; Browning v. State, 26 Texas Crim. App., 432; Boyett v. State, 26 Texas Crim. App., 689; Covey v. State, 23 Texas Crim. App., 388; Self v. State, 28 Texas Crim. App., 398; Phelps v. State, 15 Texas Crim. App., 45."

After a careful study of the record herein, we think the trial judge could correctly conclude, as he doubtless did, that the absent witness would not testify as appellant alleged he would, and that even if he did, his testimony in that respect would not be probably true; and we think he was well justified in so believing and holding, and that under the facts and circumstances of this case no reversible error is presented by the court's action in overruling his motions for continuance and denying him a new trial because thereof.

It became a material question whether the open knife which was found upon the body of the deceased some time after he was killed, was appellant's knife. Appellant introduced his wife, who produced, identified and it was introduced in evidence, another knife,—not the one found on deceased,—which she testified and claimed she got out of appellant's pocket that night after the killing, and was the only knife he then or prior thereto had owned. The State was permitted to cross-examine her on this matter. The bill states it pretty full, but it is lengthy and unnecessary to copy it.

Again, appellant had his wife to testify that about three years before the killing she saw her son, the deceased, have a gun, and heard him say in connection therewith that he was going to kill "Lee Stacy with his own G—d d—n gun and shells." On cross-examination the State was permitted, over appellant's objections, to have the wife testify to the facts and circumstances connected with the said threat by the deceased and the action of deceased in connection therewith, and that he soon afterwards permanently left her home, but returned repeatedly before the killing and talked with and to appellant, and was friendly with him, etc. Appellant contends that in these particulars the State could not cross her and have her to detail said facts. We have repeatedly in recent years considered and written upon this subject. We see no necessity to again review the question. It is clear to us that the cross-examination of appellant's wife in this instance was legitimate and proper and in no way in violation of the statute or any decision of this court, but, in effect, entirely in harmony therewith. Roberts v. State, 74 Texas Crim. Rep., 150, 168 S. W. Rep., 100; Taylor v. State, 74 Texas Crim. Rep., 3, 167 S. W. Rep., 56; Johnson v. State, 72 Texas Crim. Rep., 387, 162 S. W. Rep., 512, and the cases and authorities cited in each of them.

Appellant has one bill complaining of the action of the court regarding the argument of Mr. Frazier, one of the attorneys for the prosecution, and of certain remarks used by him therein. It is stated in the

bill that the court refused to permit the appellant's attorneys to object to the language of Mr. Frazier at the time it was being uttered, but required them to wait till the speech was concluded and then he would act upon it and they could request their special charges to the jury on the subject. The bill, it seems, contains the stenographer's report of what occurred, taken down at the time. The court, in explanation of the bill, expressly states that appellant's allegation therein that he refused to hear objections to Mr. Frazier's argument at the time and required them to wait till he had concluded "is incorrect," and he states, and we think is substantiated by the stenographer's report, that they did object during the time and were not required to wait until the conclusion of the speech. We think this bill shows no error. We think also that the language used by Mr. Frazier in argument was based on the evidence or inference therefrom. The court gave some of appellant's special charges requiring the jury not to consider certain language of Mr. Frazier. We think none of this shows any reversible error on the part of the court as held by a long line of decisions of this court. Pierson v. State, 18 Texas Crim. App., 524; House v. State, 19 Texas Crim. App., 227; Tweedle v. State, 29 Texas Crim. App., 586. It is unnecessary to cite the many other cases.

The three questions above discussed, as we understood from appellant's attorneys in the submission of this case, were the points on which they relied for reversal. They assign some other questions. We have examined all of them, and in our opinion, none of them present any error.

The judgment will, therefore, be affirmed.

*Affirmed.*

DAVIDSON, JUDGE.—1. I believe the continuance ought to have been granted either at beginning of the trial or on the later application during trial. I may write more at length on this question if rehearing is refused.

2. The error complained of in regard to the charge—not discussed in the opinion—in court's failure to submit self-defense from attack or apparent attack by John Casey as well as deceased, is well taken. The court limited self-defense to acts only of deceased. The other issue is presented from the facts as I understand them.

ON REHEARING.

June 2, 1915.

PRENDERGAST, PRESIDING JUDGE.—In the submission of this case we understood appellant, through his attorneys, conceded that the only questions necessary to be decided were those discussed in the original opinion.

However, his attorneys claim that while they only presented those questions in oral argument at the time, none of the others were waived

but were relied upon. It, therefore, becomes necessary to now pass on all these questions.

We have again reviewed the case and all the questions in it and are confirmed in the opinion that no reversible error was committed by the trial court.

We will state succinctly the material testimony. Adam Butcher, with his family, lived about three and one-half miles about south from Aquilla, in Hill County. Appellant at the time of the trial was a young man twenty-five years old. He had married a widow, Mrs. Stacy, about four years before the killing. Mrs. Stacy had three times before then been married to other men and had children by each of them. Her last husband before appellant was also named Stacy but no relation of appellant. Mrs. Stacy was about fifty-two years old when she married appellant, or at least, at the time of his trial she was that old. At the time they were married four of the Stacy children, two girls and two boys, lived with their mother. The two boys, John and Joe, were then, respectively, about fifteen and thirteen years old. Both of them after this marriage quit their home and struck out for themselves. Each, however, returned to their mother's and appellant's home from time to time, and occasionally stayed a few days at a time. The two girls were still younger than these boys. It seems about a year after the marriage, trouble arose between Joe, the deceased, and appellant, which resulted in Joe removing, and thereafter remaining, from his home. At the time of the homicide appellant with his wife and her said two daughters lived in Aquilla. On the night of May 7, 1914, Butcher gave a dance at his house in honor of appellant and invited thereto a considerable number of guests, and among them John and Joe Stacy, who attended the dance. Appellant took his wife and said two girls in the buggy with him to the dance that night. However, he armed himself with a pistol buckled around him, which he carried to the dance and kept on his person concealed until he killed deceased therewith.

Just before or about midnight, in the progress of the dance, John Stacy was going to dance with his sister, Kitty, in one of the sets. Kitty was then about fifteen or sixteen years old. Appellant forbade her dancing with John and prevented her doing so. This incensed John and he left the house, went out some, perhaps, thirty steps therefrom, others with him or soon afterward followed him, where he proceeded to vent his spleen to them about appellant, and curse and abuse and threatened he would whip him. Joe and Butcher being made aware, or hearing the disturbance, went out to where John was. Appellant also went out of the house about this time outside of the yard about his buggy and stopped some thirty yards from where John and the others then were. He heard at least a part of what was said by John and Joe at this time and heard, as he states, the threats to whip him, etc. Butcher and Joe, and perhaps others, undertook to pacify John, and did pacify him, he agreeing to drop the matter, which he did. He put on his coat and started back into the house. In passing back to the

house he passed in four or five steps of where appellant was at the time,. and after passing him some five or six steps, with his back toward appel- lant, and doing nothing and saying nothing to appellant, appellant then shot and instantly killed Joe, who was standing three or four feet from him.

Adam Butcher testified that after quieting John they all started to the house, John ahead. He said: "I saw Lee Stacy as we were going to the house. When I first saw him he walked up to Joe, in about four or five feet of him, and I heard him tell Joe for them to cut that out and cut it out quick; he just says, 'Now, you G—d d—n boys, cut this out and cut it out quick'; that is the words he said. . . .. Joe stopped when Lee spoke to him. When Joe stopped Will Wright was right up close. to him on the left hand side of him and I was on the right hand side of him and about four or five feet maybe from him. When Lee Stacy said that I looked around and Joe said something,. but I never understood what Joe said, and Lee shot him. Lee just pulled his gun out and rested his elbow against his side, just that way (illustrating) and shot. He rested his elbow against his right side. The weapon he used was a pistol. When Lee Stacy fired the shot Joe Stacy was just standing there with his hands down, and when Lee started to shoot he threw his left hand up. Lee had pulled his pistol before Joe throwed his hand up. Before Lee pulled his pistol Joe was just standing still with his hands down that way (illustrating). At the time that Lee Stacy made the remark that I have testified to and drew his pistol I saw Joe Stacy's hands. There was nothing between me and Joe Stacy at that time, and I was only about four or five feet from him. It was a nice, pretty, bright moonlight night; the moon was about straight up and down. There was nothing where I was or where Joe Stacy was or where Lee Stacy was at that time to prevent me from seeing the parties. When the pistol fired Joe Stacy just tum- bled down, fell to the ground backwards and a little bit on his left side. I saw his hands when he fell; one of them was lying across his breast and the other was lying on the ground stretched out. The right hand was lying stretched out, open on the ground with the palm up. The left hand was lying open on his breast. There was nothing in the palm of Joe Stacy's right hand when he was lying there on his side and back on the ground. There was nothing on his breast or his body at that time at or near his hand where it was lying on his breast. I went to the body after Joe fell, went right to it immediately after he fell. Lum Hardin also went to the body at that time. Mr. Lee Stacy told me to see if Joe Stacy was dead and to phone for the doctor." This witness then states that he went into the house and phoned for the doctor; that this kept him some fifteen minutes in the house. He then states that he went back out to the body of deceased, and then for the first time saw an open knife on the body of the deceased, lying on or about his right shoulder.

Will Wright testified that he was standing right at and with Joe when appellant shot him,—so close that he was powder burned from appel-

lant's pistol shot. He said: "I saw Joe Stacy's hands at the time that Lee fired. They were down by his side and were open just like a man would have his hands down. There was nothing in his hands at that time." He further said Joe was bareheaded and in his shirt sleeves.

Mrs. Butcher testified that she was standing on her gallery when the shot was fired and went immediately to the body of the deceased. That she felt of the head and pulse of the deceased, kneeled down by him and felt of his other hand, and said: "There was not anything in either one of his hands at that time." Further, "there was no knife or weapon of any kind on his shoulder here at that time that I seen. There was nothing there between me and the body to prevent me from seeing a knife on his shoulder here if there had been one there."

The next day after the killing the justice of the peace held an examining trial, and among other witnesses who testified for the State, was Lum Hardin, the witness whose absence appellant sought a continuance for. His testimony was taken down in writing and signed by him. After telling about being out where John and Joe were when John was venting his spleen against appellant he went back into the house. We then quote his evidence:

"I was in house about five minutes and went out in front and heard John fussing and talking, and I 'lowed it was a row. When I got out there I heard him speaking about Lee, didn't understand what he said. At that time Lee was standing out ten or twelve steps from where the boys were standing and I guess about twenty-five or thirty steps in front of the house. Joe and somebody else, I think Mr. Butcher, were holding John. Joe said, 'It ain't no use in talking about it so much. We will just whip the damn son—bitch.' Lee said, 'Turn them aloose. I don't think there is any harm in 'em,' something like that. John kept walking toward the house with Joe. Joe stopped and at that time he was north of Lee and going west towards the house. I don't know why Joe stopped. At time he stopped he was four or five steps from Lee. The direction that Lee was going at time he stopped would have led him to door of the house. At time Joe stopped I was a step or two from Lee and four or five from Joe. If Joe Stacy said anything I don't remember. I never heard Joe say anything that I recollect before the shooting. Joe stopped and turned to his left facing Lee, and Lee immediately reached back and pulled his gun and shot Joe. He didn't pull the gun so overly quick. I never noticed whether or not Joe had anything in his hands at time of shooting. Lee said something about a knife, but I don't remember what it was he said. I don't remember whether he made that statement before Joe stopped or afterwards, or before he shot Joe or afterwards. Immediately after Lee shot Joe, in a minute or two, I and Mr. Butcher walked by Joe. I walked slowly by Joe and looked at him. I was four or five steps from him and it was light so I could see him distinctly. I could see his face, and arms and legs clearly. I saw no knife about his person, I again looked at Joe's body up close enough to see him plainly, when the doctor come.

Vol. 77 Crim.-5

After the doctor got there I looked at Joe's body again and saw a knife laying upon Joe's right breast up over his right lung. It was a two-bladed knife with little blade open. The knife was lying lengthwise with his body, with the blade pointing up towards his head.

(Snd)        Lum Hardin."

Cross: "I came out at the east door at opposite side from door I went in. Lee was out in front of house and I walked to side of Lee and put my hands on his shoulder and said something. Me and him talked a few words, but I disremember what we talked about. Somebody was standing there with Lee. John and Joe were walking by Lee and Joe stopped. The remark Lee made about a knife was immediately before or at time of the shooting. The second time I looked at Joe's body Lee told me to go for doctor."

All the testimony shows that appellant remained out about the body of the deceased some little time after he sent Butcher to telephone for the doctor. All of the witnesses who testified on the subject testified that when they later saw and examined the body of the deceased that they then for the first time saw an open pocketknife lying on the body of the deceased about his right shoulder. No evidence is given showing that this knife was the knife of deceased. The State introduced evidence tending strongly to show, and from which the jury were clearly justified to believe, that this knife was appellant's knife and opened and placed on the body of deceased by appellant after he had killed him.

Appellant testified said knife was not his knife and that he did not place it on the body of the deceased, and that when Joe, deceased, got in about six or eight feet of him, "Why, I says to Joe, I says, 'Joe,' I says, 'there is not any use of this,' and he said something back to me and I didn't understand what it was, and when he did why I pulled a gun and shot him. At the time I shot he was coming on to me with a knife. At the time I spoke he was about as far as from here to that outfit there, and when I shot him he was something like three feet, maybe three and a half feet or four feet from me. At the time I shot him he was standing just about in that position (illustrating), For instance, like I was standing there, he was standing like this (illustrating), and when I pulled the gun out he had his knife in his hand coming onto me. He had the knife in his right hand, and when he seen me go for the gun he reached this way with his left hand; I taken it he was reaching for the gun, and when he did I pulled the trigger," claiming that he killed him in defense of his person.

But little further need be said about the court's overruling appellant's application for a continuance and refusing a new trial on that ground. Appellant overlooks the fact that we did pass upon the question in the original opinion from the basis of the State having had a subpoena issued for the absent witness. We cite two of the decisions appellant now cites (Mixon v. State, 36 Texas Crim. Rep., 66, and Byrd v. State, 39 Texas Crim. Rep., 609), and quoted what Judge White said on the subject. It is unnecessary to repeat that here. The bills

on the subject of the court's refusal to continue are very lengthy. A careful consideration of them, we think, demonstrates that neither the State nor the appellant used any sufficient diligence before the case was called for trial to ascertain the whereabouts of the absent witness or havè him served. Both sides apparently relied alone on the fact that at the time of the killing, more than six months before this trial, Lum Hardin was then a resident of Hill County; no inquiry whatever was made after that to ascertain where the witness was; that some considerable time before the trial, the time not being definitely shown, said witness had left Hill County. How long he had been gone is not shown and none of the parties seemed to have ascertained even this fact until after the case was called for trial. Any diligence, the slightest, by either side, would unquestionably have ascertained this fact and in ample time to have had him subpoenaed and in attendance if in the State, or if out of the State, his depositions could have been taken.

In the two cases cited and relied upon by appellant, McMillan v. State, 66 Texas Crim. Rep., 288, 146 S. W. Rep., 1190, and Valigura v. State, 68 Texas Crim. Rep., 12, 150 S. W. Rep., 778, more diligence was therein shown than herein. Besides, in each of those cases on the motion for rehearing the appellants therein procured and filed in connection with their motions for new trial the affidavit of the absent witnesses specifically stating what they would testify, which, in each instance, would show that the appellants therein were not guilty, and both of those cases were reversed for that reason. No such affidavit, nor any, is shown in this case.

Appellant offers no new argument or authority in support of his contention that the State's cross-examination of Mrs. Stacy, wife of appellant, was improper. We correctly passed upon that question in the original opinion and cited some of the authorities.

The only other question discussed in the opinion was appellant's complaint to the argument of Mr. Frazier and the action of the court in connection therewith. This was sufficiently stated in the original opinion and some of the cases therein cited. In addition, on that point we cite Mooney v. State, 76 Texas Crim. Rep., 539, where we review this question more fully and cite other authorities.

Miss Josie Wright was a young lady who lived in the same community where deceased and appellant lived. She testified that deceased visited her very often just before he was killed (appellant testified he knew this); that they were engaged to be married and had fixed the time in July, 1914, to be married; that in March before he was killed in May she and her mother went on a visit to North Texas and were away on this visit when deceased was killed. That the appellant saw her often in passing back and forth and that he made love to her repeatedly; that appellant asked her if she and Joe were going to marry, and she told him they were, and that he also asked her mother, and her mother told him that they were, and "he said we should not marry; that he would kill him first"; that this occurred just before she and her mother left on said visit. Appellant, it seems, made no

objection to this evidence when introduced.   At least, there is no bill
of exceptions thereto.   But he asked, and the court refused, to give a
special charge not to consider the testimony of Miss Josie Wright in
regard to an alleged threat of defendant.   It was shown that the mother
of Miss Wright died before the trial.   Mrs. Will Wright was permitted
to testify, over appellant's objection, that she saw appellant the even-
ing before deceased was killed that night; that he had a conversation
with her in which he asked her if she knew whether Joe and Josie were
going to marry or not, and if she knew when Josie and Mrs. Wright, her
mother, were coming back; that she told him she.did not know when
they would return, and that she did not know whether Joe and Josie
were going to get married or not, but that Carrie, Joe's half-sister,
said that they were going to marry in June.   Appellant said, "I bet
you a thousand dollars against a nickel they don't marry in June."

Clearly, under all of 'the authorities, the testimony of Miss Wright
and Mrs. Wright, just above stated, was admissible to show threats,
motive, malice, and intent by appellant.   White's Ann. P. C., secs.
1230-1231.

The record shows that when the trial judge prepared his charge he
submitted it, as required by the statute, to appellant's attorneys; that
they made several objections thereto.   Thereupon, the court, doubtless
in order to meet these, or to properly correct his charge as pointed out
by the exceptions, rewrote it; that when again presented to appellant's
attorneys they made only this exception to subdivision 16 of it, which
is preserved by bill of exception:   "2nd—Said charge is defective in
failing to tell the jury that the defendant had a right to defend against
apparent danger from either John Stacy or Joe Stacy or both of them
and in failing to advise the jury of the rights of the defendant if he
believed the attack or threatened attack was by both of them."

In order to discuss this question we will quote the whole of the court's
charge on the subject of self-defense.   It is:

"15.   You are further instructed that a reasonable apprehension of
death or serious bodily harm will excuse a person in using all neces-
sary means to protect his life or person, and it is not necessary that
there should be actual danger, provided he acted upon a reasonable
apprehension of danger as it appeared from his standpoint at the time;
and in such case the party acting under real or apparent danger is in
no event bound to retreat in order to avoid the necessity of killing his
assailant.   If, therefore, from the evidence you believe that the de-
fendant killed the said Joe Stacy, yet if you believe that the words, acts
and conduct, or either, of the deceased, at the time of or just before
the killing, caused the defendant to have a reasonable·expectation or
fear of death or serious bodily injury, and that acting on such reason-
able expectation or fear the defendant killed the deceased, or if you
have a reasonable doubt as to said matters, then the killing was in self-
defense, and you should acquit the defendant, and so say by your ver-
dict; and in determining the question as to whether or not the defend-
ant had a reasonable apprehension or fear of death or serious bodily

harm at the time he killed the deceased, if he did kill him, you must view the matter from the standpoint of the defendant at the time, and from his standpoint alone; and if the defendant had a reasonable expectation or fear of death or serious bodily harm, viewing the matter from his standpoint alone at the time, he had a right to shoot until he believed himself to be out of danger.

"16.  You are instructed that if the deceased was attacking or about to attack the defendant with a deadly weapon under the law it would be presumed that he intended to kill the defendant.  And if you have a reasonable doubt from the testimony as to whether the deceased attacked the defendant or was about to attack the defendant with a deadly weapon, or viewing the matter from the defendant's standpoint, the defendant had a reasonable apprehension that the deceased was attacking or about to attack the defendant with a deadly weapon you will indulge the presumption that the deceased intended to kill in favor of the defendant."

It is clear from the record that in order to meet this objection the appellant requested and the court gave, just as asked, his special charge No. 3, as follows:

"Gentlemen of the Jury:  You are instructed that if you believe from the evidence that defendant was attacked by Joe Stacy or by Joe and John Stacy or was threatened with attack by them or either of them that he was not bound to retreat but had the right to stand his ground and defend against such attack."  At any rate, this special charge is all that should, under any of the testimony of this case, have been given. All the evidence, without any doubt, shows that notwithstanding John Stacy had wanted by his talk, to whip appellant and applied in the hearing of others and in appellant's hearing opprobrious epithets about him, yet, at the instance of Joe Stacy and others he had entirely abandoned any attack upon appellant, and had expressly agreed to do so; that he thereupon put on his coat and started back into the house to the dance; that in so going he passed in four or five steps of appellant, in plain view of him, and appellant did not deny this, though he said he did not see him do so.  The testimony of no witness shows or tends to show that at the time and just immediately prior to when appellant killed deceased that John Stacy said or did anything whatever showing an attack or any contemplated attack whatever upon appellant then. All the witnesses who testified on the subject showed that John Stacy was going back into the house at the time.  Adam Butcher testified, "It was about fifteen or twenty feet, I expect, from where Joe Stacy was shot to where Johnny had got at the time of the shooting; Johnny was right at the steps that lead over the fence.  I had stopped there when Lee walked up to Joe, and Joe and Lee had stopped when I last saw Johnny Stacy going on towards the house.  I never measured how close Johnny Stacy passed to Lee, but I guess it was about five or six feet."  Substantially to the same effect is the testimony of Will Wright. The justice of the peace made a map of the ground and its surroundings where the killing occurred.  The location of where the deceased

fell and the appellant stood when he killed him is shown by the map exhibited before the jury and the places pointed out. John Stacy testified: "When I heard the report of the pistol that killed Joe I was in about three steps of these steps here going over the fence. In going to that point within three or four steps of the steps leading over the red fence I met and passed Lee Stacy before I got to where I was when the pistol fired. At the time that I passed Lee he was out up towards the yard fence, up towards that big tree, and was in about four or five steps of me when I passed him. My brother, Joe, was behind me at the time that I passed Lee. . . . I was about ten steps, I guess, from the steps leading over the fence when I first saw and passed Lee. There was no one with me at the time I passed him; I was by myself."

On this point appellant himself swore that after the party started away from where Johnny had been cursing at and abusing him: "I seen Joe start towards me, but I would not say which way Johnny was. I would not swear that Johnny passed me or where he went to, it was crowded up there, there was several of them there, and I would not swear that he did pass me. I had my eyes on Joe. . . . As to whether I saw the two boys, Joe and John as they started away from there going toward the house, I will say that I saw Joe as he started towards me. . . . I won't swear that I saw them both coming towards me. I did not say awhile ago that they both came at me; I said that Joe did. The last time I seen John was when Joe started towards me. When Joe started to me they were standing there, the whole crowd was all standing around there, and when Joe said what he did, why I kept my eyes right on him, and never looked to see which way Johnny did go, where he was at. I heard John curse me, but I didn't keep my eyes on him because I kept my eyes on Joe; from what he said I had a good right to watch him. I didn't have the same right to watch John because Joe started to me and I never did see where John went to." As stated, the testimony of no witness, nor all of it together, shows or tends to show that John Stacy did or said anything at the time of the killing to show that he then was making or attempting to make any attack whatever upon appellant, and the testimony shows that he then said nothing to Joe to in any way encourage or induce him, Joe, to attack appellant.

No one can question the law that where an attack is made upon an accused by two persons, they both being present, or by one person when the other is present in any way aiding or encouraging the attack that the accused would have the right to defend against both as well as either, and whenever the evidence raises such a question it would be proper for the court to correctly charge the jury on the subject; but in this case the evidence shows that John Stacy was not in any way making any attack upon appellant, nor in any way aiding Joe to do so. On the contrary it excludes any such idea. So that the court committed no error on this point as claimed by appellant.

The motion is overruled.

*Overruled.*

DAVIDSON, JUDGE.—I dissent. 1. Continuance is fully sufficient and ought to have been granted. Absent witness would have corroborated defendant, who testified in his own behalf, as to the knife in hands of deceased, and the attack by deceased and his brother.

2. Charge was not sufficient on self-defense against the attack of the two brothers.

3. The court should have permitted exceptions to the speech of county attorney at time of making it, and not required defendant's counsel to wait termination of county attorney's argument. Besides, the speech was clearly improper.